# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:19-cv-1179

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) **FIRST AMENDED COMPLAINT** |
| UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, | ) ) ) ) |
| Defendant. | ) ) ) |

## NATURE OF THE CASE

1. Plaintiffs Center for Biological Diversity and Sierra Club (collectively, "Conservation Groups") bring this citizen enforcement action to enforce repeated violations by the University of North Carolina at Chapel Hill ("UNC") of the permit issued under Title V of the Clean Air Act for the operation of air pollution sources on UNC's campus. In violation of that permit and applicable law, UNC has burned more coal than the permit allows in its coal burning boilers, has operated its polluting equipment in a manner that can cause violations of health- and public welfare-based national ambient air quality standards, and has violated other requirements in its air pollution permit.

2. The air pollution that UNC emits can cause a wide variety of adverse impacts including asthma attacks, decreased lung function, especially among young

1

people, and even premature mortality. *See, e.g., North Carolina v. TVA*, 593 F.Supp.2d 812, 822 (W.D.N.C. 2009) *rev'd on other grounds*, 615 F.3d 291 (4th Cir. 2010) (In tort case against coal-fired power plants "Court finds that, at a minimum, there is an increased risk of incidences of premature mortality in the general public associated with [air pollution] exposure").

3. The citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604, allows the Conservation Groups to enforce the Clean Air Act, including UNC's air pollution permit, as "private attorneys general." *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 17 (1981). The citizen suit "provides no incentives to suit other than to protect the health and welfare of those suing and others similarly situated." *Id.*, 453 U.S. at 17, n.27.

## JURISDICTION, VENUE, AND NOTICE

4. This Court has jurisdiction over this Clean Air Act citizen suit pursuant to 42 U.S.C. § 7604(a) ("The district courts shall have jurisdiction without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, … and to apply any appropriate civil penalties") and 28 U.S.C. § 1331 (federal question statute). This action seeks injunctive and declaratory relief and civil penalties, as authorized by 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 7413, 7604(a).

2

5. UNC is located in the Middle District of North Carolina. Thus, venue is proper pursuant to 42 U.S.C. § 7604(c)(1). All challenged acts and permit violations occurred in Orange County, North Carolina.

6. In compliance with 42 U.S.C. § 7604(b) and 40 C.F.R. § 54.2, on September 17, 2019, the Conservation Groups gave UNC (specifically, Vice Chancellor for Finance and Operations Jonathan Pruitt and Cogeneration Systems Manager William Lowery II), the Administrator of the U.S. Environmental Protection Agency ("EPA"), and the North Carolina Department of Environmental Quality, Division of Air Quality, notice of the violations specified in Claims I – IX of this complaint and of their intent to file suit after sixty days.

7. In compliance with 42 U.S.C. § 7604(b) and 40 C.F.R. § 54.2, on February 24, 2020, the Conservation Groups gave UNC (specifically, Vice Chancellor for Finance and Operations Jonathan Pruitt and Cogeneration Systems Manager William Lowery II), the Administrator of the U.S. Environmental Protection Agency ("EPA"), and the North Carolina Department of Environmental Quality, Division of Air Quality, notice of the violations specified in Claim X of this complaint and of their intent to file suit after sixty days.

8. It has been more than 60 days since UNC received the Conservation Groups' notice of intent to sue letters.

## PARTIES

9. Plaintiff Center for Biological Diversity is a non-profit 501(c)(3) corporation. It is incorporated in California. The Center for Biological Diversity has approximately 67,000 members throughout the United States and the world.

10. The Center for Biological Diversity has an office in Ashville, North Carolina. It has a staff member who lives and works in the Research Triangle Park area.

11. The Center for Biological Diversity's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health through science, policy, and environmental law. Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, the Center for Biological Diversity is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for all of us.

12. Plaintiff Sierra Club is the oldest and largest grassroots environmental organization in the United States, with nearly 780,000 members nationally, including more than 20,000 members in North Carolina. Sierra Club is a nonprofit, membership organization. It is incorporated in California. Its national headquarters are located in Oakland, California. Its North Carolina offices are located in Raleigh, North Carolina.

13. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the

natural and human environment; and to use all lawful means to carry out these objectives. Sierra Club and its members are greatly concerned about the effects of air pollution on the environment and human health and have a long history of involvement in activities related to air quality and source permitting under the Clean Air Act.

14. The Conservation Groups' members live, work, study, recreate, travel, and engage in other activities throughout the areas at issue in this complaint and will continue to do so on a regular basis. Pollution from UNC in the affected areas threatens and damages, and will continue to threaten and damage, the health and welfare of Conservation Groups' members as well as their ability to engage in and enjoy their other activities. Pollution from UNC diminishes the Conservation Groups' members' ability to enjoy the aesthetic qualities and recreational opportunities of the affected area.

15. UNC's failure to timely perform the reporting and other obligations under its air pollution permit also adversely affects the Conservation Groups, as well as their members, by depriving them of procedural protection and opportunities, as well as information that they are entitled to under the Clean Air Act. UNC's failure to comply with its air pollution permit also causes harm by creating doubt and concern for the Conservation Groups' members as to whether they are exposed to excess air pollution.

16. The above injuries will continue until the Court grants the relief requested herein.

17. Defendant UNC is a constituent institution of the University of North Carolina.

## LEGAL BACKGROUND

18. The core purpose of the Clean Air Act is the protection of public health against the effects of harmful air pollution. *See* 42 U.S.C. § 7401(b)(1). Consistent with this goal, the Act requires EPA to establish National Ambient Air Quality Standards ("NAAQS") requisite to protect public health and welfare. *See* 42. U.S.C. § 7409(b)(1).

19. State agencies, including the North Carolina Division of Air Quality, must develop and implement plans that include "applicable requirements," 40 C.F.R. § 70.2(1). Compliance with applicable requirements advances attainment and maintenance of the ambient air quality standards and other standards. One way these applicable requirements are executed with respect to individual facilities is through permitting programs established under Title V of the Act. *See* 42 U.S.C. §§ 7410, 7661.

20. Major stationary sources of air pollution cannot operate except in compliance with an air pollution permit issued pursuant to Title V of the Clean Air Act. 42 U.S.C. § 7661a(a). Such permits "shall include enforceable emission limitations and standards . . . and such other conditions as are necessary to assure compliance with applicable requirements of this chapter, including the requirements of the applicable implementation plan." 42 U.S.C. § 7661c(a); *see also* 40 C.F.R. § 70.6(a)(1).

21. The Division of Air Quality issues Title V air pollution permits for individual facilities that include enforceable emission limitations and standards necessary to assure those facilities' compliance with all applicable requirements. 42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6(a)(1).

22. The Clean Air Act's citizen suit provision provides that any person may commence a civil action against any person who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any "emission standard or limitation." 42 U.S.C. § 7604(a)(1).

23. The Clean Air Act defines "emission standard or limitation" to include "any other standard, limitation, or schedule established under any permit issues pursuant to subchapter V of this chapter . . . , [and] any permit term or condition". 42 U.S.C. § 7604(f)(4).

24. Thus all of the standards, limitations, terms and conditions of UNC's air pollution permit are enforceable through a Clean Air Act citizen suit.

25. Furthermore UNC's air pollution permit itself provides in Section 3.A.5 that ". . . all terms and conditions contained herein shall be enforceable by the DAQ, the EPA, and citizens of the United States as defined in the Federal Clean Air Act."

## FACTS

26. On September 10, 2014, the North Carolina Division of Air Quality issued UNC Air Quality Permit No. 03069T32. Permit No. 03069T32 is a permit issues pursuant to subchapter V of the Clean Air Act. Thus, it is known as a Title V permit.

27. On November 9, 2014, the North Carolina Division of Air Quality issued UNC Air Quality Permit No. 03069T33. On June 16, 2016, the North Carolina Division of Air Quality issued UNC Air Quality Permit No. 03069T34. On March 22, 2018, the North Carolina Division of Air Quality issued UNC Title V Air Quality Permit No.

03069T35. Permits 03069T32, 03069T33, 03069T34 and 03069T35 shall herein be collectively referred to as UNC's air pollution permit.

28. UNC's air pollution permit covers dozens of sources of air pollution on UNC's campus.

29. UNC's largest sources of air pollution are Boilers 6 and 7. They are listed as Emission Sources (ES) 001 and 002, respectively, in UNC's air pollution permit.

30. Boilers 6 and 7 are capable, and do, burn coal, natural gas and No. 2 fuel oil.

## CLAIMS FOR RELIEF

31. The allegations in the preceding paragraphs are incorporated by reference as if restated fully herein.

**I. Violation of Heat Input Limits for Boilers 6 and 7**

32. Section 2 of UNC's air pollution permit is entitled "Specific Limitations and Conditions."

33. Section 2.1 provides: "The emission source(s) and associated air pollution control device(s) and appurtenances listed below are subject to the following specific terms, conditions, and limitations, including the testing, monitoring, recordkeeping, and reporting requirements as specified herein." Permit at 10 (§ 2.1).

34. The following section, Section 2.1.A, establishes a limit of 323.17 million British Thermal Units per hour ("mmBtu/hr") heat input capacity for each of UNC's two

8

coal/natural gas/No. 2 fuel oil/wood fired circulating fluidized combustion boilers, ID Nos. ES-001-Boiler #6 and ES-002-Boiler #7. *Id.* Heat input is a measure of the amount of coal which is burned. The more coal that is burned, the more pollution emitted, all else being equal.

35. Boiler 6 exceeded the 323.17 mmBtu/hr limit by operating at approximately 332 mmBtu/hr on December 17, 2014.

36. Similarly, Boiler 7 exceeded its 323.17 mmBtu/hr limit by operating at approximately 342 mmBtu/hr on December 18, 2014.

37. The Center for Biological Diversity has requested on numerous occasions from UNC all hourly heat input data for Boilers 6 and 7. UNC has repeatedly refused to provide the requested records.

38. Upon information and belief, UNC has repeatedly exceeded the 323.17 mmBtu/hr limit for Boilers 6 and 7 on numerous other occasions since 2014 in violation of Section 2.1.A of UNC's air pollution permit and will continue to do so.

II. **Violations of Readiness Testing Operational Records Requirement**

39. Permit condition 2.2.A of UNC's air pollution permit prohibits operation of certain emergency generation units except in limited circumstances—*e.g.*, they may be operated in order to test their readiness, but only when certain other sources of pollution are not operating. Permit at 44 (§ 2.2.A). Specifically, permit condition 2.2.A requires:

> In order to ensure that combustion sources (emergency generators (ID Nos. ES-EG#2l, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48, ESGen-49, and fire water pump ES-FP-3)) do not contribute to an exceedance of the 1-hour

9

NO₂ National Ambient Air Quality Standard (NAAQS); the Permittee may only operate these generators (ID Nos. ESEG# 21, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48 and ES-Gen-49) for readiness testing when generators (ID Nos. ES-006 and ES-007) are not operating and when readiness testing is not being performed for any other emergency generator, except ES-EG#21, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gcn-48, ES-Gen-49, and fire water pump ES-FP-3. . . .

The Permittee shall maintain operational records sufficient to demonstrate that combustion sources (emergency generators (ID Nos. ES-EG#2 l, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48, ESGen-49, and fire water pump ES-FP-3) have not operated for readiness testing during the concurrent operation of generators (ID Nos. ES-006 and ES-007) and the performance of readiness testing of any other emergency generator, except ES-EG#2 I, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48, ESGen- 49, and fire water pump ES-FP-3…

The Permittee shall be deemed in noncompliance with 15A NCAC 02D.050l(c) if the above records are not maintained.

*Id.*

40. From March 22, 2018 on, UNC has repeatedly failed to maintain operational records sufficient to demonstrate that combustion sources (emergency generators (ID Nos. ES-EG#2l, ES-Gen-12, ES-Gen-13, ES-Gen-43, ESGen-48, ESGen-49, and fire water pump ES-FP-3) have not operated for readiness testing during the concurrent operation of generators (ID Nos. ES-006 and ES-007) and the performance of readiness testing of any other emergency generator, except ES-EG#21, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48, ES-Gen-49, and fire water pump ES-FP-3. Therefore, UNC is in repeated violation of 15A NCAC 02D.0501(c) and permit condition 2.2.A.1.

41. UNC has admitted that records of the specific hours of operation have repeatedly not been maintained by UNC for the diesel-fired emergency generator located

at Kenan Stadium (emission source ID number ES-Gen-48). Therefore, UNC's records do not conclusively demonstrate that ES-Gen-48 was not operated for readiness testing while the other emergency generators were operating.

### III. Violations of Air Cleaner Inspection Requirements

42. Permit condition 2.1.G.3.k of UNC's air pollution permit requires UNC to, every 1000 hours of operation or annually, whichever comes first, inspect the air cleaner of each of its eighty-two diesel-fired, compression ignition, emergency generators listed in permit section 2.1.G. Permit at 37. According to section 2.1.G.3.l of the Permit, the permittee is deemed to be in noncompliance with 15A NCAC 2D.1111 if the above requirements are not met. *Id.*

43. UNC has failed to inspect the air cleaner of any of its eighty-two emergency generators, from June 16, 2016 to December 31, 2016 as well as each day in 2017, and 2018. Thus, UNC is in repeated violation of 15A NCAC 2D.1111 and permit condition 2.1.G.3.k and l.

### IV. Violations of Monthly Particulate Matter Inspections Requirements

44. Permit condition 2.1.D.1.c.i. requires that UNC assure compliance with particulate matter emission controls from the coal handling, conveying, and storage system via monthly external visual inspection of the system ductwork and material collection unit for leaks. Permit at 27. The permittee is deemed to be in noncompliance with 15A NCAC 02D.0515 if the inspection requirement is not satisfied. *Id.*

11

45. UNC failed to perform monthly external visual inspections of the system ductwork and material collection unit for Coal Silo #1 Bin Vent Filter (ID No. CD-011) from June through December of 2016. Furthermore, UNC failed to perform monthly external visual inspections of the system ductwork and material collection unit for Coal Silo #2 Bin Vent Filter (ID No. CD-012) during March and October of 2016. Therefore, UNC is in repeated violation of 15A NCAC 02D.0515 and permit condition 2.1.D.1.c.i.

V. **Violations of Coal Ash Visible Emissions Inspections Requirements**

46. Permit condition 2.1.E.2.c of UNC's air pollution permit requires that UNC once a day observe the emission points for the coal ash handling, storage, and loading system (ID No. ES-030 and ES-0303A). Permit at 30. Permit condition 2.1.E.2.d requires UNC to maintain a logbook for these observations. *Id.* The permittee shall be deemed in noncompliance with 15A NCAC 02D.0521 if these records are not maintained. *Id.*

47. UNC did not maintain a logbook of these observations between January 1, 2018 and November 29, 2018. Thus, UNC is in repeated violation of 15A NCAC 02D.0521 and permit condition 2.1.E.2.c.

48. Furthermore, on November 1, 2, 3, and 4 of 2017, UNC claimed in its logbook that it conducted the required visual observation at 7 am. However, it was dark at 7 am on those dates: twilight was at 7:13 am and sunrise was at 7:39 am on November 1, 2017; twilight was at 7:14 am and sunrise was at 7:40 am on November 2, 2017; twilight was at 7:15 am and sunrise was at 7:41 am on November 3, 2017; and twilight

12

was at 7:16 am and sunrise was at 7:42 am on November 4, 2017. Thus, UNC did not maintain accurate records for these days in repeated violation of 15A NCAC 02D.0521 and permit condition 2.1.E.2.c.

**VI.     Violations of Coal Ash Silo Bagfilter Inspection Requirements**

49.     Permit condition 2.1.E.c of UNC's air pollution permit requires monthly inspections of the coal ash system ductwork and material collection unit for leaks and annual internal inspection of the bagfilters structural integrity during the period of seasonal down time for the bagfilter for the coal ash storage silo (ID No. CD-031). Permit at 29. Permit condition 2.1.E.1.d requires a logbook be maintained for these inspections as well as any maintenance performed. The Permittee is deemed in noncompliance with 15A NCAC 02D.0515 if the ductwork and bagfilters are not inspected and maintained or if the logbook is not maintained. *Id.*

50.     The logbook does not include any record of an inspection for October 2016. Thus, UNC failed to conduct this monthly inspection for October, 2016. Therefore, UNC is in repeated violation of 15A NCAC 02D.0515 and Permit condition 2.1.E.1.d and/or permit condition 2.1.E.1.c.

**VII.    Violations of Carbon Monoxide Emission Requirements**

51.     Permit condition 2.1.A.4.b. of UNC's air pollution permit limits carbon monoxide emissions from Boilers 6 and 7 (ID Nos. ES-001 and ES-002) based on carbon monoxide levels corrected to 7% oxygen. Permit at 13–14.

52. However, UNC's December 2014 Emissions Test Report for Boilers 6 and 7 reports carbon monoxide emissions from Boilers 6 and 7 corrected to 15% oxygen. Thus, UNC is in repeated violation of permit condition 2.1.A.4.b.

**VIII. Violations of Reporting Requirements to DAQ and EPA**

53. Permit condition 3.I.A.3.a. of UNC's air pollution permit requires UNC to notify the North Carolina Division of Air Quality of any deviations from permit requirements other than emissions and malfunction deviations in a written, certified, quarterly report. Permit at 56. This report must detail the likely cause of the deviation and any preventative or corrective actions taken. *Id.*

54. UNC has failed to notify the North Carolina Division of Air Quality of the non-emissions and non-malfunction permit deviations described in claims one through seven via written, certified, quarterly reports. These repeated failures are violations of 15A NCAC 02D.0515 and permit condition 3.I.A.3.a.

55. Further, permit condition 3.P. requires UNC to notify the North Carolina Division of Air Quality and the U.S. Environmental Protection Agency (EPA) annually of any deviations from permit terms and conditions during the prior calendar year via UNC's annual compliance certification. Permit at 57.

56. UNC has failed to notify the North Carolina Division of Air Quality and EPA of deviations from permit terms and conditions described in claims one through seven via UNC's annual compliance certification. Thus, UNC is in repeated violations of permit condition 3.P.

## IX. Violations of Daily Calibration Drift Assessment Requirements

57. Permit conditions 2.1.B.1.c, 2.1.B.2.e and 40 CFR Part 60, Appendix F, Quality Assurance Procedure 1 require UNC to conduct and report a daily Calibration Drift Assessment for the continuous emissions monitoring system for Boiler #8 (ES-003). Permit at 20–21.

58. On June 22, 2019, UNC failed to perform a daily Calibration Drift Assessment for Boiler 8. Therefore, UNC is in violation of 15A NCAC 02D.0524, permit conditions 2.1.B.1.c, 2.1.B.2.e, and 40 CFR Part 60, Appendix F, Quality Assurance Procedure 1.

## X. Violations of Readiness Testing Limitations

59. Permit condition 2.2.A of UNC's Title V permit requires:

> In order to ensure that combustion sources (emergency generators (ID Nos. ES-EG#2l, ES-Gen-12, ESGen-13, ES-Gen-43, ES-Gen-48, ES-Gen-49, and fire water pump ES-FP-3)) do not contribute to an exceedance of the 1-hour N02 National Ambient Air Quality Standard (NAAQS); the Permittee may only operate these generators (ID Nos. ES-EG#21, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48 and ES-Gen-49) for readiness testing when generators (ID Nos. ES-006 and ES-007) are not operating and when readiness testing is not being performed for any other emergency generator, except ES-EG#21, ESGen- 12, ES-Gen-13, ES-Gen-43, ES-Gcn-48, ES-Gen-49, and fire water pump ES-FP-3.

Permit at 44 (§ 2.2.A).

60. UNC has operated some combination of combustion sources (e.g., emergency generators ES-EG#2l, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48,

15

ESGen-49, and fire water pump ES-FP-3) for readiness testing during the concurrent operation of some combination of generators (ID Nos. ES-006 and ES-007) and the performance of readiness testing of emergency generators other than ES-EG#21, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48, ES-Gen-49, and fire water pump ES-FP-3.

61. Specifically, in its November 15, 2019 correspondence to the Center for Biological Diversity, UNC stated that "[t]he University has reviewed its records and found one documented running conflict on September 20, 2018, that lasted 32 minutes.

62. Therefore, UNC is in violation of 15A NCAC 02D.0501(c) and permit condition 2.2.A.

## PRAYER FOR RELIEF

WHEREFORE, the Conservation Groups ask that this Court enter judgment in their favor and against Defendant, and grant the following relief:

63. Declare that UNC repeatedly violated and continues to violate the Clean Air Act;

64. Permanently enjoin UNC from operating its air pollution sources except in accordance with the Clean Air Act and UNC's air pollution permit and to take all steps appropriate to ensure future compliance;

65. Order UNC to remediate the environmental damage resulting from its violations;

66. Assess civil penalties against UNC in the amount of $37,500 per day per violation for violations occurring after November 12, 2009 until November 2, 2015, of $44,539 per day per violation for violations occurring after November 2, 2015 until January 15, 2017, and of $45,268 per day per violation for violations occurring after January 15, 2017, pursuant to 42 U.S.C. § 7413 and 40 C.F.R. § 19.4;

67. Order that, pursuant to 42 U.S.C. § 7604(g)(2), $100,000 of the civil penalties assessed against UNC be used in beneficial mitigation projects to enhance public health and the environment;

68. Retain jurisdiction of this action to ensure compliance with the Court's order;

69. Award the Conservation Groups their costs of litigation, including reasonable attorney and expert fees, pursuant to 42 U.S.C. § 7604(d); and

70. Grant such other relief as the Court deems just and proper.


Dated: July 6, 2020              Respectfully submitted,


                                                  /s/ Perrin W. de Jong
                                           Perrin W. de Jong N.C. Bar No. 42773
                                           Attorney for Plaintiffs
                                           Center for Biological Diversity
                                           P.O. Box 6414
                                           Asheville, NC 28816
                                           Telephone: (828)252-4646
                                           Email: perrin@biologicaldiversity.org

    /s/ Robert Ukeiley
Robert Ukeiley[1] Colorado Bar No. 26747
Attorney for the Plaintiffs
Center for Biological Diversity
1536 Wynkoop St., Ste. 421
Denver, CO 80202
Telephone: (720) 496-8568
Email: rukeiley@biologicaldiversity.org

    /s/ Bridget M. Lee
Bridget M. Lee[2] New York ID No. 4521720
Attorney for the Plaintiff
Sierra Club
9 Pine Street, Suite D
New York, NY 10005
Telephone: (845) 323-5493
Email: bridget.lee@sierraclub.org

*Counsel for Center for Biological Diversity and Sierra Club*

---

[1] Pursuant to LR83.1(d) Robert Ukeiley, a member in good standing of the bar of the Colorado Supreme Court, appears by special appearance in association with Perrin de Jong, a member of the bar of this Court.

[2] Pursuant to LR83.1(d) Bridget Lee, a member in good standing of the bar of the Court of Appeals of New York, appears by special appearance in association with Perrin de Jong, a member of the bar of this Court.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:19-cv-1179

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, ) ) ) Plaintiffs, ) ) v. ) ) UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, ) ) ) Defendant. ) ) | **CERTIFICATE OF SERVICE** |

I hereby certify that a copy of the foregoing document was served on counsel for Defendant via the Court's ECF system.

This the 6th day of July, 2020.

    /s/ Perrin W. de Jong
Perrin W. de Jong N.C. Bar No. 42773
Center for Biological Diversity
P.O. Box 6414
Asheville, NC 28816
Telephone: (828)252-4646
Email: perrin@biologicaldiversity.org

*Attorney for the Plaintiffs*

19