# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## Case No.: 1:19-cv-1179-CCE-JLW

**CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,**

              **Plaintiffs,**

**vs.**

**UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL,**

              **Defendant.**

**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Defendant The University of North Carolina at Chapel Hill ("UNC"), by and through undersigned counsel, submits this Memorandum of Law in Support of its Motion to Dismiss Plaintiffs' First Amended Complaint (the "Complaint").

# TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 1

FACTUAL AND LEGAL BACKGROUND .............................................................. 2

    Permit Requirements in the Act ........................................................................ 2

    UNC's Permit ...................................................................................................... 2

    Citizen Suits ........................................................................................................ 3

    Repeated Violations ............................................................................................ 3

    DEQ Action ......................................................................................................... 6

    General Standard of Review of Rule 12(b)(6) Motion ..................................... 7

ANALYSIS OF PLAINTIFFS' INDIVIDUAL CLAIMS ....................................... 8

    Claim I .................................................................................................................. 8

    Claim II .............................................................................................................. 11

    Claim III ............................................................................................................ 13

    Claims IV though IX ........................................................................................ 17

    Claim IV ............................................................................................................ 17

    Claim V .............................................................................................................. 18

    Claim VI ............................................................................................................ 20

Claim VII ........................................................................................21

Claim VIII ......................................................................................22

Claim IX ........................................................................................23

Claim X ..........................................................................................24

CONCLUSION .......................................................................................25

CERTIFICATE OF COMPLIANCE ..........................................................26

CERTIFICATE OF SERVICE ..................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare Inc.*,
  367 F.3d 212 (4th Cir.2004)...........................................................................6, 7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................*passim*

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................7, 8

*Burford v. Sun Oil*,
  319 U.S. 315 (1943).....................................................................................2, 16

*Colo. River Water Conservation Dist. v. United States*,
  424 U.S. 800, 814 (1976)................................................................................16

*E. Shore Mkts., Inc. v. J.D. Assocs. L.P.*,
  213 F.3d 175 (4th Cir. 2000).............................................................................8

*Ellis v. Gallatin Steel Co.*,
  390 F.3d 461 (6th Cir. 2004)...........................................................................15

*Friends of the Earth v. Consolidated Rail Corp.*,
  768 F.2d 57 (2nd Cir.1985)...............................................................................4

*Glazer v. American Ecology Environmental Services*,
  894 F. Supp. 1029 (E.D. Tex. 1995)...............................................................5, 6

*Gwaltney of Smithfield v. Chesapeake Bay Foundation*,
  484 U.S. 49 (1987)............................................................................................4

*Johnson v. Collins Entm't Co.*,
  199 F.3d 710, 718-19 (4th Cir. 1999).............................................................16

*MCL Auto., LLC v. Town of S. Pines*,
  532 F.3d 269 (4th Cir. 2008)...........................................................................16

iii

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
    *491 U.S. 350 (1989)* ...................................................................................16

*Philips v. Pitt Cnty. Mem'l Hosp.*,
    *572 F.3d 176 (4th Cir.2009)* ...........................................................................7

*Phillips v. LCI Int'l Inc.*,
    *190 F.3d 609 (4th Cir.1999)* ...........................................................................7

*S. Alliance for Clean Energy v. Duke Energy Carolinas, LLC*,
    *2009 WL 1940048 (W.D.N.C. July 2, 2009)* .....................................................15

*Walker v. S.W.I.F.T. SCRL*,
    *517 F.Supp.2d 801 (E.D.Va. 2007) (emphasis added)* ........................................6

**Federal Statutes**

*42 U.S.C. § 7604(a)(1)* ....................................................................................3, 5

*42 U.S.C. § 7604(b)(1)(B)* ..............................................................................6, 14

*42 U.S.C. § 7604(f)(3)* ...................................................................................3, 10

*42 U.S.C. § 7661a(a)* .........................................................................................2

*Clean Air Act, Amendments of 1990, Pub.L. No. 101-549, § 707(g), §*
    *304(a), 104 Stat.* .............................................................................................5

Federal Clean Air Act, *42 U.S.C. § 7401 et. seq.* .....................................................1

*The Honorable Henry A. Waxman, An Overview of the Clean Air Act*
    *Amendments of 1990, 21 Envt'l Law 1721, 1816 (1991)* ......................................5

**State Statutes**

N.C. Gen. Stat. § 143-215.114 ...............................................................................15

N.C. Gen. Stat. § 150B-23, *et seq.* ........................................................................17

North Carolina Administrative Procedure Act .........................................................17

iv

**Rules**

Rule 12(b)(1)..................................................................................2, 16

Rule 12(b)(6)............................................................................1, 6, 7, 16

**Regulations**

40 C.F.R. pt. 70, Appendix A ......................................................................2

40 CFR pt. 60 Appendix F.........................................................................23

# **Preliminary Statement**[1]

UNC brings this motion pursuant to Rule 12(b)(6) with respect to each of Plaintiff's claims. Plaintiffs bring all ten of their claims pursuant to the citizen suit provisions of the Federal Clean Air Act, *42 U.S.C. § 7401 et. seq.* (the "Act"). Those citizen suit provisions authorize private citizens, under certain well-defined circumstances, to bring actions to enforce certain provisions of the Act. Plaintiffs base all of their claims on alleged violations of certain conditions of a permit issued to UNC by the North Carolina Department of Environmental Quality (the "DEQ") pursuant to the Act. Each of Plaintiffs' claims fails because each lacks an essential element required to state a claim on which a citizen may bring a suit under the Act. As discussed more fully below, Plaintiffs' first claim fails because the condition of the Permit Plaintiffs allege UNC violated is not as a matter of law an emission standard or limitation that may serve as the basis for a citizen's suit under the Act. Plaintiffs' second through tenth claims all fail because they are based on allegations of violations of the Act that are alleged to have occurred wholly in the past and are not ongoing, but do not provide any proper basis for the Court to presume those past

---

[1] Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court should consider the factual allegations contained in the Complaint as true. Without admitting the facts are true, UNC incorporates the facts alleged in the Complaint. Specifically, and without limiting the generality of the foregoing, UNC does not admit that the Plaintiffs have standing to bring these claims.

violations were "repeated" violations of the Act as is required by the Act's citizen suit provisions. In addition, Plaintiffs' third claim fails also because the DEQ has commenced an action against UNC based on the violation alleged in the claim, and such an action bars any citizen suit based on that violation. With respect to that third claim, UNC brings this motion also pursuant to Rule 12(b)(1), because this Court should refuse to exercise jurisdiction over Claim III pursuant to the abstention doctrine established in *Burford v. Sun Oil, 319 U.S. 315 (1943)("Burford").*

## FACTUAL AND LEGAL BACKGROUND

**Permit Requirements in the Act.** The Act prohibits the operation of any facility (a "Major Source") which emits or may emit more than specified levels of air pollutants except in compliance with the terms of a permit issued pursuant to the Act (or other limited circumstances not relevant to the case at bar). *42 U.S.C. §7661a(a).* The United States has delegated to the State of North Carolina the authority to issue permits and administer the permitting program with respect to any Major Sources located in North Carolina. 40 C.F.R. Part 70, Appendix A.

**UNC's Permit**. UNC is a constituent institution of the University of North Carolina. UNC operates a coal-, natural gas-, and fuel oil-fired electricity and steam generating facility (the "Facility") at its Chapel Hill campus. The Facility is a Major Source for purposes of Section 7661a of the Act. UNC applied for and received the

2

required permit. On November 9, 2014, pursuant to subchapter V of the Act, the Division of Air Quality ("DAQ") of the DEQ issued Air Emissions Permit 03069T33 to UNC. On June 16, 2016, the DAQ issued Air Quality Permit 03069T34 to UNC, and on March 22, 2018, the DAQ issued Air Emissions Permit 03069T35 to UNC. *Complaint*, ¶ ¶ 26, 27. Air Emissions Permits 03069T33, 03069T34, and 03069T35 constitute the permits relevant to this action and are referred to herein collectively as the "Permit." A copy of the Permit is attached as Exhibit 1.

**Citizen Suits**. The Act provides that "any person may commence a civil action on his own behalf . . . against any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . any emission standard or limitation under" the Act. *42 U.S.C. § 7604(a)(1)*. [2] The Act further defines "emission standard or limitation" to mean "any *condition or requirement* of a permit issued pursuant to subchapter V" of the Act. *42 U.S.C. §7604(f)(3) (emphasis added))*.

**Repeated Violations.** All of Plaintiffs' claims are based on allegations that UNC had violated some provision of the Permit prior to the Filing of the Complaint.

---

[2] The Act provides that no action may be commenced prior to 60 days after the plaintiff has given notice of the violation to the Administrator of the United States Environmental Protection Agency, to the State in which the violation occurs, and to the alleged violator. UNC does not dispute that Plaintiffs did give such notice more than 60 days prior to filing their Complaint.

The Complaint does not allege any ongoing violations of the Act or the Permit. The requirement that a citizen suit may be based on allegations that the defendant had violated the Act in the past only if there is evidence the violation has been repeated has its origin in the case of *Gwaltney of Smithfield v. Chesapeake Bay Foundation, 484 U.S. 49, (1987)* in which the Supreme Court held that federal courts lack jurisdiction over "wholly past violations" under the Clean Water Act ("CWA"). *Id. at 57*. The Court based its conclusion on an analysis of the citizen suit provision in the CWA, which authorizes a citizen suit against a defendant who is alleged to be in violation of that act. *Id.* The Court held that jurisdiction is proper under this provision, if the plaintiff makes a good faith allegation of *continuous or intermittent violations*. *Id. at 64, (emphasis added)*.

Initially, *Gwaltney* had a significant impact upon actions under the Act as well, because the Act's citizen suit provision at the time mirrored the Clean Water Act's citizen suit provision. *See Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 57 (1987); Friends of the Earth v. Consolidated Rail Corp., 768 F.2d 57, 63 (2nd Cir.1985).* However, the applicability of *Gwaltney* to claims under the Act was affected by Congress when it amended the Act in 1990. The 1990 amendments to the Act add a basis for citizen suit jurisdiction: a civil action for wholly past violations may be commenced, if the plaintiff alleges that the

4

violations have been repeated. *Clean Air Act, Amendments of 1990, Pub.L. No. 101-549, sec. 707(g), § 304(a), 104 Stat. at 2683; see also The Honorable Henry A. Waxman, An Overview of the Clean Air Act Amendments of 1990, 21 Envt'l Law 1721, 1816 (1991).* Plaintiffs may maintain a citizen suit against UNC, if and only if they have sufficiently alleged continuous or intermittent violation of the Act in such manner as to satisfy section 7604(a) (1), i.e., if the plaintiffs have alleged a past violation which has been repeated. 42 U.S.C. § 7604(a) (1). *See Glazer v. American Ecology Environmental Services, 894 F. Supp. 1029 (E.D. Tex. 1995).*

The Act does not define the term "repeated."  Merriam-Webster defines the primary meaning of the term to be "renewed or recurring again and again." That common usage definition comports with the purpose of the relevant sections of the Act where the term appears. The Act does not authorize, and has never authorized, citizen suits based on isolated violations that have occurred wholly in the past.   To bring a citizen suit, a plaintiff must allege that past violations have been repeated, in the sense of having been "continuous or intermittent." *Id*.   To bring a citizen suit, that is, a plaintiff must allege that the violations have occurred over and over again.

In 1990, Congress could have amended the Act to provide that a citizen suit could be brought as a result of a past violation if there is evidence the past violation occurred more than once.  Congress did not so amend the Act, so we can presume

that the amendment Congress did enact means something different. Congress meant, UNC asserts, that amendment would authorize citizen suits based on alleged past violations only if those violations occurred multiple times or intermittently. *Id.*

**DEQ Action**. The Act further provides that no action may be commenced "if the State has commenced and is diligently prosecuting a civil action in a court . . . of a State to require compliance" with the standard alleged to be violated. *42 U.S.C. §7604(b)(1)(B)*. UNC urges this court, in considering UNC's motion to dismiss Claim III, to consider a set of documents that is extrinsic to the Complaint. UNC understands that, in ruling on a motion to dismiss pursuant to Rule 12(b)(6), a court may not consider extrinsic evidence at the 12(b)(6) stage, generally. Where, however, "a defendant attaches a document to its motion to dismiss, `a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare Inc., 367 F.3d 212, 234 (4th Cir.2004) (citing Phillips v. LCI Int'l Inc., 190 F.3d 609, 618 (4th Cir.1999)).* An integral document is a document that by its "very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Walker v. S.W.I.F.T. SCRL, 517 F.Supp.2d 801, 806 (E.D.Va. 2007) (emphasis added).* In addition to integral and authentic exhibits, on a 12(b)(6) motion the court "may

6

properly take judicial notice of matters of public record." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir.2009).

UNC attaches hereto as <u>Exhibit 2A</u> a Notice of Violation ("NOV") issued to UNC by the DEQ and as <u>Exhibit 2B</u>, the DEQ's letter to UNC indicating that the NOV has been completely resolved. As discussed below, this NOV is an action to require UNC to comply with the certain "readiness testing" requirements in the Permit that are the subject of Plaintiffs' Claim III, and asks the Court to consider the NOV as part of its consideration of this Motion to Dismiss. First, the nonexistence of such a DAQ action relating to the readiness testing requirements is prerequisite to any prosecution of a citizen suit claim based on those requirements, so the Court may consider pursuant to the doctrine set forth in *Am. Chiropractic, supra*. In addition, the NOV is a matter of public record, and the Court may also consider it pursuant to the doctrine set forth in *Phillips, supra.*

**General Standard of Review of Rule 12(b)(6) Motion**. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). Allegations merely consisting of "labels and conclusions and a formulaic recitation of the elements of a cause of action will not do," nor will

7

"'naked assertions' devoid of further factual enhancement." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. In particular, courts "are not bound to accept as true a legal conclusion couched as a factual allegation" or "unwarranted inferences, unreasonable conclusions, or arguments." *Iqbal,* 556 U.S. at 678; *E. Shore Mkts., Inc. v. J.D. Assocs. L.P.*, 213 F.3d 175, 180 (4th Cir. 2000). Further, for a claim to be plausible on its face, not just any facts suffice. Instead, Plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. Importantly, a complaint cannot survive a motion to dismiss when the facts alleged are "'merely consistent with' a defendant's liability." *Id*. If a claim for relief is not both plausible on its face and supported by sufficient, well-pleaded factual allegations to establish the claim, it must be dismissed. *See Id*.

## ANALYSIS OF PLAINTIFFS' INDIVIDUAL CLAIMS

**Claim I.** In Claim 1, Plaintiffs allege that Section 2.1.A of the Permit establishes a limit of 323.17 million British Thermal Units per hour (mmBtu/hr) heat input capacity for each of UNC's circulating fluidized combustion boilers. *Complaint ¶ 34*. Plaintiffs also allege that Boiler 6 exceeded such limit on December 17, 2014 and that Boiler 7 exceeded such limit on December 18, 2014. *Complaint ¶¶ 35, 36*. The Complaint also alleges that "upon information and belief, UNC has

8

repeatedly exceeded the 323.17 mmBtu/hr limit for Boilers 6 and 7 on numerous occasions since 2014."

First, the 332.17 mmBtu/hr reference in the Permit is in no way an emission standard or limit that may be enforced by means of a citizen suit under the Act. The caption or introductory language to Section 2.1.A of the Permit describes the emissions sources subject to that section.

Section 2.1 of the Permit (*Permit, p. 10*) provides:

> **2.1 - Emission Source(s) and Control Devices(s) Specific Limitations and Conditions**
> The emission source(s) and associated air pollution control device(s) and appurtenances listed below are subject to the following specific terms, conditions, and limitations, including the testing, monitoring, recordkeeping, and reporting requirements as specified herein:
>
> **A. Two coal/natural gas/No. 2 fuel oil/wood (non-CISWI) torrified wood (non-CISWl) -fired, circulating fluidized combustion boilers (323.17 million Btu per hour heat input capacity each, ID Nos. ES-001-Boiler #6 and ES-002-Boiler #7, NSPS-Subpart Db) with associated bagfilters (ID Nos. CD-004 and 005).**
> (emphasis in original)

Section 2.1.A continues that "the following provides a summary of limits and/or standards for the emission sources described above." *Id.* That sentence in turn refers to a chart included in Section 2.1.A that sets forth 13 separate limits and standards applicable to the sources described above. *Permit, pp. 10-11.* None of those 13 limits or standards relate to heat input capacity or in any way refer to the 323.17

9

mmBtu/hr heat input capacity, let alone establish it as a limit or standard. As described above in the legal background section, 42 U.S.C. §7604(f)(3), on which Plaintiffs expressly rely, provides that a citizen suit must be based on an allegation of a violation of a "condition or requirement" of a permit. It is clear from Section 2.1.A of the Permit that the heat input capacity is used simply and solely to identify the sources subject to Section 2.1.A, not to establish an emission standard or limitation. Indeed, by its very terms it relates to input not emissions. The limits and standards in Section 2.1.A all do relate to substances emitted from the boiler (some emissions limits are based on the actual heat input experienced by the boiler). The heat input portion of the description of the emission source regulated by Section 2.1.A is not an emission standard or limit that may be enforced by a citizen suit. Because Plaintiffs' Claim I is based in its entirety on alleged or purported violations of the supposed heat input capacity, the Court should dismiss Claim I.

Even if the heat input capacity portion of the description or identification of the boilers were construed as an emissions standard or limitation, Claim I would still not state a cognizable claim under the Act. Claim I alleges one violation of the heat input capacity "limitation" relating to each boiler, each violation alleged to have occurred on a specified date in December in 2014. Those violations are in the past, but they can not in any way be described as repeated or intermittent. Plaintiffs claim

10

that "upon information and belief, UNC has repeatedly on numerous occasions since 2014" violated that heat input capacity "limitation." As discussed above, though, under *Iqbal*, allegations merely consisting of "labels and conclusions and a formulaic recitation of the elements of a cause of action will not do," nor will "'naked assertions' devoid of further factual enhancement." Plaintiffs mere allegation upon information and belief that an essential element of their claim exists is clearly insufficient under *Iqbal* to allow their claim to survive a motion to dismiss. UNC asserts, therefore, the Court may dismiss Claim I on that basis as well.

**Claim II**. In Claim II, Plaintiffs allege that UNC has repeatedly failed, as required by Section 2.2.A of the Permit, to maintain operations records sufficient to demonstrate that six specified emergency generators and one fire water pump covered by the Permit were operated for readiness testing only when the boilers identified in Section 2.1.A of the Permit (discussed in Claim I, above) are not operating and when readiness testing is not being performed for any other emergency generator (with certain specified exceptions not applicable here). *Complaint, ¶ 40.* Specifically, Section 2.2.A of the Permit provides:

> In order to ensure that combustion sources (emergency generators (ID Nos. ES-EG#2l, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48, ESGen-49, and fire water pump ES-FP-3)) do not contribute to an exceedance of the 1-hour NO2 National Ambient Air Quality Standard (NAAQS); the Permittee may only operate these generators (ID Nos. ESEG# 21, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48 and ES-

11

Gen-49) for readiness testing when generators (ID Nos. ES-006 and ES-007) are not operating and when readiness testing is not being performed for any other emergency generator, except ES-EG#21, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gcn-48, ES-Gen-49, and fire water pump ES-FP-3. . . .

The Permittee shall maintain operational records sufficient to demonstrate that combustion sources (emergency generators (ID Nos. ES-EG#2 l, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48, ESGen-49, and fire water pump ES-FP-3) have not operated for readiness testing during the concurrent operation of generators (ID Nos. ES-006 and ES-007) and the performance of readiness testing of any other emergency generator, except ES-EG#2 I, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48, ESGen- 49, and fire water pump ES-FP-3...

*Permit, p. 20.* The Permit thus limits the hours the enumerated emergency generators and fire water pump may operate each year but contemplates "readiness testing" to ensure that the equipment will be ready to operate if needed. Section 2.2.A also provides that UNC "shall be deemed in noncompliance with 15A NCAC 02D .050l(c) if the above records are not maintained." *Id.*

First, Claim II includes only the allegation that "from March 22, 2018 on, UNC has repeatedly failed to maintain operation records" required by the Permit. It is not clear from the Complaint whether Plaintiffs allege that such failure was absolute and that UNC maintained no records from March 22, 2018 until the time Plaintiffs filed the Complaint. If Plaintiffs are alleging that the failure to maintain records occurred sporadically in the past but was not ongoing at the time of the filing

12

of the Complaint, then this Court should dismiss Claim II because, as is the case with Claim I, under *Iqbal,* labels and conclusions and a formulaic recitation of the elements of a cause of action are not sufficient to defeat a motion to dismiss, nor are naked assertions devoid of further factual enhancement. Plaintiffs provide no information whatsoever as to why they believe or assert that UNC has failed to maintain such records. Plaintiffs' Complaint does not explain how Plaintiffs have determined what records UNC actually maintained, and how they determined certain records do not exist.

**Claim III**. In Claim III, Plaintiffs allege violations of Permit condition 2.1.G.3.k of the Permit which requires UNC to, every 1000 hours of operation or annually, whichever comes first, inspect the air cleaner of each of the eighty-two emergency generators listed in Permit section 2.1.G. The Permit provides that UNC is deemed to be in noncompliance with 15A NCAC 2D.1111 if the above records are not maintained. *Complaint, ¶ 42.* Plaintiffs alleged that UNC has failed to inspect the air cleaner of any of such generators, from June 16, 2016 to December 31, 2016 as well as each day in 2017 and 2018. *Complaint, ¶ 43.* First, because, as Plaintiffs admit in the Complaint, the relevant Permit condition requires inspections annually or after 1,000 hours of operation, Plaintiffs have not alleged any facts showing that any inspections were required between June 16 and December 31, 2016. Without

13

an allegation of the hours of operation of any generator subject to the inspection requirements, the Court has no basis for finding that any inspection was required during that six-month period, because, in the absence of allegations regarding hours of operation, there is no reason to believe any inspections were required at all between June and December 2016.

Further, whether Plaintiffs allege these violations are current or past, the DEQ has issued the NOV. The NOV alleges that UNC failed to maintain records of inspections on one emergency generator in 2017 and four emergency generators in 2018. The NOV asked that UNC provide certain specified information to the DEQ regarding the required records, and UNC supplied the requested information in conversations with the DEQ, as described in the DEQ's letter attached as Exhibit 2B. The DEQ reviewed that information, and other information UNC had submitted prior to the issuance of the NOV, and that DEQ concluded that UNC had "adequately revised [its] monitoring and reporting strategies to address the identified deficiencies, so no further response is required." As discussed above the Act bars a citizen suit based on an allegation of a violation "if the State has commenced and is diligently prosecuting a civil action in a court . . . of a State to require compliance" with the standard alleged to be violated. *42 U.S.C. §7604(b)(1)(B)*. The NOV is a State action to require compliance with the precise standard that is the basis of

Plaintiffs' Claim III. UNC notes, that while the NOV is not in a court of the State of North Carolina, N.C. Gen. Stat. §143-215.114, which authorizes assessment of civil penalties for violations of air permit requirements and is cited in the NOV, provides that:

> If any civil penalty has not been paid within 30 days after notice of assessment has been served on the violator, the Secretary shall request the Attorney General to institute a civil action in the Superior Court of any county in which the violator resides or has his or its principal place of business.

The DEQ may not begin an action in court until it has assessed a penalty and the alleged violator fails to pay the penalty. The issuance of the NOV is a prerequisite to any action in Court by the State. The NOV should act to preclude Plaintiffs' Claim III. Congress authorized citizen suits under federal environmental statutes to allow citizens to seek redress from the courts if regulators failed to do their job. *Ellis v. Gallatin Steel Co., 390 F.3d 461, 475 (6th Cir. 2004).* Congress did not allow plaintiffs, under the guise of citizen suits, to ask a court to second-guess regulators that are acting pursuant to their regulatory expertise. *See also S. Alliance for Clean Energy v. Duke Energy Carolinas, LLC, 2009 WL 1940048, (W.D.N.C. July 2, 2009)* (relating to an issuance of an air permit by DEQ, as opposed to a notice of violation, and holding that federal intervention should not disrupt North Carolina's "strong and major interest in the health and well-being of its citizens and in the orderly conduct of proceedings to protect them").

15

If the Court is not inclined to dismiss Claim III pursuant to Rule 12(b)(6) on grounds of the existence of a State action, UNC requests in the alternative that the Court dismiss Claim III pursuant to Rule 12(b)(1) because the doctrine of abstention established in the *Burford* case. Under the *Burford doctrine,* litigation of Plaintiff's Claim III after the NOV has been issued by DEQ and resolved, would present exactly the type of challenge from which federal courts are instructed to abstain. The Burford doctrine counsels abstention by federal courts "[w]here timely and adequate state-court review is available," and (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 361 (1989) (quoting Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 814 (1976)).* Abstention's "central idea has always been one of simple comity." *MCL Auto., LLC v. Town of S. Pines, 532 F.3d 269, 280 (4th Cir. 2008) (quoting Johnson v. Collins Entm't Co., 199 F.3d 710, 718-19 (4th Cir. 1999)).* The DEQ administers Permits under the Act. This Court, pursuant to *Burford* and its progeny, should defer to the DEQ's prosecution of the NOV to resolve any alleged violations

16

of the inspection requirements set forth in Claim III. For the Court to impose some requirements on UNC that are different from, or in opposition to, the requirements the DEQ imposes through the issuance of the NOV, risks interference in the creation of the coherent enforcement policy the DEQ is implementing. Plaintiffs would not be left without a remedy. If Plaintiffs are not satisfied with the ultimate result of the DEQ's prosecution of the NOV, Plaintiffs could bring a contested case pursuant to the North Carolina Administrative Procedure Act, if Plaintiffs are "persons aggrieved" by the DEQ's action (equivalent to a showing of standing in this case.) *See N.C. Gen. Stat. §150B-23, et seq*.

**Claims IV though X**. UNC asks the Court to dismiss each of Claims IV through IX because each relates to Permit violations Plaintiffs allege to have occurred in the past, but in each case, Plaintiffs fail to allege, in any manner that would avoid dismissal under the *Iqbal* standards, that the violations were repeated. The specifics of each claim are discussed below.

**Claim IV**. Claim IV relates to Permit condition 2.1.D.1.c.i., which requires that UNC assure compliance with particulate matter emission controls from the coal handling, conveying, and storage system via monthly external visual inspection of the system ductwork and material collection unit for leaks. UNC is deemed to be in

17

Case 1:19-cv-01179-CCE-JLW   Document 20   Filed 07/23/20   Page 23 of 33

noncompliance with 15A NCAC 02D.0515 if the inspection requirement is not satisfied. *Complaint ¶ 44.*

Plaintiffs allege that UNC failed to perform monthly external visual inspections of the system ductwork and material collection unit for Coal Silo #1 from June through December of 2016 and failed to perform monthly external visual inspections of the system ductwork and material collection unit during March and October of 2016. *Complaint ¶ 45.* Under the *Iqbal* standards, though, Plaintiffs must present some factual enhancement of the allegation, not the mere naked assertions of Paragraph 45 of the Complaint. The Complaint does not even explain why Plaintiffs believe UNC violated that Permit condition, let alone providing a basis for the Court to allow this claim to survive UNC's motion to dismiss.

**Claim V**. Claim V is based on Permit Condition 2.1.E.2.c, which requires that UNC once a day observe the emission points for the coal ash handling, storage, and loading system. Condition 2.1.E.2.d requires UNC to maintain a logbook for these observations. The Permit provides that UNC shall be deemed in noncompliance with 15A NCAC 02D.0521 if these records are not maintained. *Complaint ¶ 46.*

Plaintiffs allege that UNC did not maintain a logbook of these observations between January 1 and November 29, 2018 and allege therefore that UNC is in

18

violation of 15A NCAC 02D.0521 and Permit Condition 2.1.E.2.c. *Complaint ¶ 47.* Setting aside the question whether failure to maintain a logbook for a certain period in the past is one violation or repeated violations, Plaintiffs again here make a mere naked assertion of noncompliance with the Permit requirements. UNC admits that is would be difficult for Plaintiffs to prove a negative (no logbook is maintained) but Plaintiffs provide no explanation as to why they believe no logbook was maintained for the identified period. The unfounded allegations of Paragraph 47 in Claim IV simply do not meet the *Iqbal* standards and are therefore susceptible to dismissal.

Continuing Claim V in Paragraph 47 of the Complaint, Plaintiffs allege that from November 1 through November 4, 2017, UNC claimed in its logbook that it conducted the required visual observation at 7 am. Plaintiffs allege that twilight was at 7:13 am on November 1, and sunrise was at 7:39 am. Plaintiffs allege that on November, twilight was at 7:14 am and sunrise was at 7:40 am. Plaintiffs allege that on November 3, twilight was at 7:15 am and sunrise was at 7:41 am. Finally, Plaintiffs allege that on November 4, twilight was at 7:16 am and sunrise was at 7:42 am. Those allegations are completely immaterial. Permit Condition 2.1.E.2.c, *Permit, p. 30*, includes absolutely no restrictions on when the required observations can or should be made. Observations taken before or after a specified time do not as a matter of law, therefore, constitute any violation of that Permit condition, and to

19

the extent Plaintiffs base their Claim V on the time of the relevant observations, the Court should dismiss Claim V.

**Claim VI**.    Claim VI is based on Condition 2.1.E.c of the Permit which requires monthly inspections of the system ductwork and material collection unit for leaks and annual internal inspection of the bagfilters structural integrity during the period of seasonal down time for the bagfilter.  Permit condition 2.1.E.d also requires UNC to maintain a logbook for these inspections. The Permit provides that UNC is deemed in noncompliance with 15A NCAC 02D.0515 if the ductwork and bagfilters are not inspected and maintained or if the logbook is not maintained.  *Complaint ¶ 49.*

Plaintiffs allege in Paragraph 50 of the Complaint that "the logbook does not include any record of an inspection for October 2016."  Plaintiffs allege therefore that UNC failed to conduct this monthly inspection for October 2016 and that therefore UNC is in violation of 15A NCAC 02D.0515 and Permit condition 2.1.E.d and Permit condition 2.1.E.c.  The Court does not need to consider whether this allegation meets the *Iqbal* standard.  Even if the allegation did meet that standard (which UNC does not concede) the allegation can not be the basis of a citizen suit because it relates to a past violation but does not allege (in any way) that the violation was repeated.  The requirement is to conduct an inspection once per month. Plaintiffs

20

allege the inspection was not conducted in one month.  Plaintiffs allege a single, not repeated, violation.  UNC therefore asks that the Court dismiss Count VI.

**Count VII**.  Count VII is based on Permit condition 2.1.A.4.b. which limits carbon monoxide emissions from Boilers 6 and 7 based on carbon monoxide levels corrected to 7% oxygen. *Complaint ¶ 51.* Plaintiffs allege that UNC's December 2014 Emissions Test Report reports carbon monoxide emissions from Boilers 6 and 7 corrected to 15% oxygen. Thus, Plaintiffs allege, UNC is in violation of permit condition 2.1.A.4.b. *Complaint ¶ 53.*  First, the actual carbon monoxide limit set forth in the Permit is a 30-day average of 133 parts per million (of air) by volume, dry ("ppmvd").  *Permit, p. 14.*  That is, running a calculation correcting to 15% oxygen, not 7%, is not a violation of the permit limit in itself.  Even assuming that the December 2014 emissions test report did indicate that the calculations in the report corrected to 15% oxygen, Plaintiffs do not show how the calculations would be different if they were corrected to 7% oxygen.  Plaintiffs do not show or explain how they can use the calculations in the December 2014 report to show that UNC violated the actual permit limit, a 30-day average of 133 ppmvd.  Without that showing or explanation, the allegations of Paragraph 51 do not show a violation of any permit limit, and therefore cannot be the basis of a citizen suit complaint.

21

Even if the Paragraph 51 allegations did amount to an allegation of a violation of a Permit limit, the allegations would still not be a basis for a cognizable citizen suit claim. Those allegations relate to a past violation (December 2014) and relate to a single alleged violation. Because Claim VII does not allege repeated violations, UNC asks the Court to dismiss Count VII.

**Count VIII**. Count VIII relates to Permit condition 3.I.A.3.a which requires UNC to notify DAQ of any deviations from Permit requirements other than emissions and malfunction deviations in a written, certified, quarterly report. *Complaint, ¶ 53.* Plaintiffs allege UNC has failed to notify DAQ of the non-emissions and non-malfunction permit deviations described in Claims I through VII. First, as described above, with the exception of Claim III, Plaintiffs' Complaint does not set forth any allegations of any violations that meet the *Iqbal* standards. The Court should not now allow Plaintiffs to bootstrap those allegations into a new claim. That is, Plaintiffs are not able to rely on allegations of violations that do not meet the *Iqbal* standards, but then transform those allegations into a new claim by alleging that UNC failed to report the violations. If the alleged violation itself does not support a cognizable claim, the failure to report the alleged violation is not a cognizable claim.

22

Claim VIII is based also on Permit condition 3.P. which Plaintiffs allege to require UNC to notify DAQ and the Environmental Protection Agency (EPA) annually of any deviations from permit terms and conditions during the prior calendar year via UNC's annual compliance certification. *Complaint, ¶ 55.* In fact, Permit condition 3.P requires the annual compliance certification to relate to **"federally enforceable"** conditions only. *Permit at 57 (emphasis added).* Plaintiffs have failed to identify any basis for asserting that any of the conditions on which Claims I through VII are based are federally enforceable. That failure serves as another basis for dismissal of Claim VIII, to the extent Claim VIII is based on any alleged violation of Permit condition 3.P.

**Claim IX**. Claim IX is based on Permit conditions 2.1.B.1.c, 2.1.B.2.e, and 40 CFR Part 60 Appendix F Quality Assurance Procedures (Procedure 1) which, Plaintiffs allege, require UNC to conduct and report a daily Calibration Drift Assessment for the continuous emissions monitoring system for Boiler #8. *Complaint, ¶ 57.* Plaintiffs allege that on June 26, 2019, UNC failed to perform a daily Calibration Drift Assessment on Boiler #8, and thereby violated 15A NCAC 02D.0524, Permit conditions 2.1.B.1.c, 2.1.B.2.e, and 40 CFR Part 60 Appendix F Quality Assurance Procedures (Procedure 1). *Complaint, ¶ 58.* At the risk of redundancy, UNC asserts that Claim IX alleges only a single, isolated past violation

23

of a Permit condition or conditions. Allegations of a single past violation that is not repeated are not bases for a citizen's suit under the Act. UNC therefore asks the Court to dismiss Claim IX.

**Claim X**. Claim X is based on Permit condition 2.2.A, the same condition that is the basis of the Plaintiffs' allegations in Claim II. As described in greater detail in the discussion of Claim II above, Permit Condition 2.2.A prevents the readiness testing of certain enumerated emergency generating equipment while certain other enumerated, non-emergency generating equipment is operating. Plaintiffs allege in Paragraph 61 of Claim X that:

> [I]n its November 15, 2019 correspondence to the Center for Biological Diversity, UNC stated that "[t]he University has reviewed its records and found one documented running conflict on September 20, 2018, that lasted 32 minutes.

That is the sole violation of Condition 2.2.A Plaintiffs allege in, and thus the sole basis of, Claim X. Taking the allegations of Paragraph 61 to be true, this violation explicitly occurred at one, 32-minute period on a specific day in the past. One discrete, historical, isolated instance of a violation of a permit condition cannot serve as the basis for a Clean Air Act citizens' suit. UNC therefore askes the Court to dismiss Claim X.

24

## **CONCLUSION**

Plaintiffs assert claims that are based on descriptions in the Permit that are not emissions standards or limitations (Claim I), or are based on past violations that Plaintiffs has not plausibly asserted were repeated (Claims II though X), or are the subject of state action (Claim III).  None of those claims are therefore cognizable under the Act.  Plaintiffs have failed to state any claim upon which relief may be granted, or over which this Court should exercise jurisdiction.  UNC therefore asks the Court to dismiss all Plaintiffs' claims.

This the 23rd day of July, 2020.

/s/ Peter J. McGrath, Jr.
Peter J. McGrath, Jr.
N.C. State Bar No. 13606
**MOORE & VAN ALLEN PLLC**
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003
Telephone: (704) 331-1000
Facsimile: (704) 331-1159
petercgrath@mvalaw.com

*Attorneys for Defendant*
*The University of North Carolina at Chapel*
*Hill*

25

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for this memorandum is less than 6250 words. The word count excludes the case caption, signature lines, cover page, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of the word-processing system used to prepare the brief.

/s/ Peter J. McGrath, Jr.
Peter J. McGrath, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of July, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notice of such filing to registered users.

/s/ Peter J. McGrath, Jr.
Peter J. McGrath, Jr.
