# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CENTER FOR BIOLOGICAL           )
DIVERSITY and SIERRA CLUB,      )
                                )
       Plaintiffs,              )
                                )
v.                              )      Case No. 1:19-cv-1179-CCE-JLW
                                )
UNIVERSITY OF NORTH             )
CAROLINA AT CHAPEL HILL,        )
                                )
       Defendant.              )
_____ )


## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES …………………….…………………………………..….i

GLOSSARY OF ACRONYMS …………………….……………………………………v

INTRODUCTION …………………….……………………………………………….1

FACTUAL BACKGROUND ………………….…….…………………………………1

LEGAL BACKGROUND ………………….…….……………………………………3

     A. Standard of Review ………………….….……………………………...3

     B. Pleading Requirement for Repeated Violations ………………….………5

     C. Clean Air Act ………………….……………………………………7

ARGUMENT ………………….……………………………………………….7

     A. Claim I ………………….………………………………………...7

     B. Claim II ………………….……………………………………...12

     C. Claim III ………………….……………………………………..14

     D. Claim IV ………………….……………………………………..17

     E. Claim V ………………….……………………………………...18

     F. Claim VI ………………….……………………………………...19

     G. Claim VII ………………….……………………………………..20

     H. Claim VIII ………………….…………………………………...21

     I. Claim IX ………………….……………………………………..22

     J. Claim X ………………….……………………………………...23

CONCLUSION ………………….……………………………………………23

Case 1:19-cv-01179-CCE-JLW   Document 23   Filed 08/13/20   Page 2 of 33

CERTIFICATION OF WORD COUNT ……………………..…………………………..25

CERTIFICATE OF SERVICE ………………………..…………………………………26

ii

# TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)…………………………………………………4, 12, 13, 18, 21

*Baughman v. Bradford Coal Co., Inc.*,
592 F.2d 215 (3d Cir. 1979)………………………………………………………...17

*Colorado River Water Conservation District v. U.S.*,
424 U.S. 800, 817-818 (1976)………………………………………………………...15

*Env't Tex. Citizen Lobby v. Exxonmobil Corp.*,
2020 U.S. App. LEXIS 24100, (5th Cir. Jul. 29, 2020)……………………………6

*Estate Constr. Co. v. Miller & Smith Holding Co.*,
14 F.3d 213 (4th Cir. 1994)……………………………………………17, 18, 20

*Evans v. B.F. Perkins Co.*,
166 F.3d 642 (4th Cir. 1999)……………………………………………………4

*Fried v. Sungard Recovery Servs., Inc.*,
916 F. Supp. 465 (E.D. Pa. 1996)……………………………………………6, 7

*Grey v. Henderson*,
169 F. Supp. 2d 448 (M.D.N.C. 2001)……………………………………………3

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987)…………………………………………………………4–6

*Heckler v. Chaney*,
470 U.S. 821 (1985)……………………………………………………………16

*N.C. Motorcoach Ass'n v. Guilford County Bd. of Educ.*,
315 F. Supp. 2d 784, (M.D.N.C. 2004)……………………………………………4

*New York v. Am. Elec. Power Serv. Corp.*,
2006 WL 1331543, (S.D. Ohio Mar. 21, 2006)……………………………………7

*Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*,
845 F.3d 133, 139 (4th Cir. 2017)……………………………………………9

iii

*Paper, Allied-Indus., Chem. & Energy Workers Int'l Union*,
    2005 WL 1389431 (W.D. Okla. June 10, 2005)…………………………………..7

*Piney Run Pres. Ass'n v. Cty. Comm'rs*,
    268 F.3d 255, 269 (4th Cir. 2001)) …………………………………………..9

*PIRG v. Star Enterprise*,
    771 F. Supp. 655 (D. N.J. 1991)…………………………………………………19

*Roosevelt Campobello Intern. Park Comm'n. v. U.S. E.P.A.*,
    711 F.2d 431 (1st Cir. 1983)………………………………………………………5

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*,
    207 F.3d 789 (5th Cir. 2000)……………………………………………………..14

*Tucker v. Chrysler Credit Corp.*,
    149 F.3d 1170 (Table), 1998 U.S. App. LEXIS 10803 (4th Cir. 1998)…………13

*United States v. Am. Elec. Power Serv. Corp.*,
    137 F. Supp. 2d 1060 (S.D. Ohio 2001)………………………………………...7

*United States v. Am. Trucking Ass'ns*,
    310 U.S. 534 (1940)………………………………………………………………10

*WildEarth Guardians v. Lamar Utils. Bd.*,
    2012 U.S. Dist. LEXIS 43307 (D. Colo. 2012)…………………………………..14

## STATUTES

42 U.S.C. § 7401(b)(2) ………………………………………………………….7, 10

42 U.S.C. § 7410 ………………………………………………………………….7

42 U.S.C. § 7604(a) ……………………………………………………1, 6, 13, 21

42 U.S.C. §7604(b)(1)(B) ………………………………………………………...14, 15

42 U.S.C. § 7604(f)(4) …………………………………………………………..22

42 U.S.C. § 7661 ………………………………………………………………….7

5 U.S.C. § 552 …………………………………………………………………….2

N.C.Gen. Stat. § 132-1 *et. seq.* …………………………………………………….........2

N.C. Gen. Stat. §143-215.114 ………………………………………………………...15

**REGULATIONS**

40 C.F.R. § 70.2(1) ………………………………………………………………….7

40 C.F.R. § 70.6(b)(1) ……………………………………………………………...21

40 C.F.R. Part 60, Appendix F, Quality Assurance Procedure 1 …………………….....22

15A NCAC 02D.0501(c) ……………………………………………………………13, 23

15A NCAC 02D.0515…………………………………………………………………....19

15A NCAC 02D.0524………..………………………………………………….……….22

**OTHER FEDERAL AUTHORITIES**

Fed. R. Civ. P. 12(b)(1) …………………………………………………….…4

Fed. R. Civ. P. 12(b)(6) …………………………………………………….....3, 4

Fed. R. Civ. P. 56(b) …………………………………………………….…20

136 Cong. Rec. S16,953 (daily ed., Oct. 27, 1990) ……………………………..…6, 8, 13

# GLOSSARY OF ACRONYMS

CAA   Clean Air Act

DAQ   North Carolina Division of Air Quality

DEQ   North Carolina Department of Environmental Quality

EPA   United States Environmental Protection Agency

FOIA   Freedom of Information Act

NAAQS  National Ambient Air Quality Standards

UNC   University of North Carolina at Chapel Hill

## INTRODUCTION

Plaintiffs Center for Biological Diversity ("Center") and Sierra Club (collectively, "Conservation Groups") brought this action pursuant to the citizen suit provision of the Clean Air Act, (hereinafter, "CAA" or the "Act"), 42 U.S.C. § 7604, alleging repeated violations of the Act at Defendant University of North Carolina Chapel Hill's ("UNC") facilities that operate pursuant to a permit issued under Title V of the Act ("Permit"). Dkt. #1, ¶1.[1] Conservation Groups' claims are based upon compliance and permitting records provided in response to public records requests and upon reasonable inferences drawn from UNC's failure to produce various records.

While styled as a motion to dismiss, Defendant in essence is asking this Court to render a decision on the merits before the parties have completed discovery. Defendant ignores the well-established rule that courts accept as true plaintiffs' allegations and draw all reasonable inferences in plaintiffs' favor at the motion to dismiss stage and asks the Court to rule on the sufficiency of the evidence before Defendant has responded to any discovery requests. This is improper. Accordingly, and for the further reasons set forth below, Defendant's Motion to Dismiss should be denied.

## FACTUAL BACKGROUND

This litigation was filed subsequent to two years of painstaking factual investigation by the Center. During this time, the Center filed twenty-five requests for

---

[1] Conservation Groups subsequently filed their First Amended Complaint on July 6, 2020, alleging an additional CAA violation as a result of an admission of such made by UNC in the course of litigation correspondence. Dkt. #17, ¶¶60-62.

1

compliance and permit records regarding UNC's Title V facilities with UNC, the North Carolina Department of Environmental Quality ("DEQ"), and the United States Environmental Protection Agency ("EPA"), pursuant to the North Carolina Public Records Act, N.C. Gen. Stat. § 132-1 *et. seq.*, and the Freedom of Information Act, 5 U.S.C. § 552, *as amended* ("FOIA").

Among other things, the Center's Public Records Act and FOIA requests sought compliance documents that are required, pursuant UNC's Title V permit, to be maintained and submitted regularly to state and federal regulatory authorities by UNC. In numerous instances, the Center was stymied in obtaining the requested records because UNC never produced them. The Center continued to make good faith efforts to obtain these records, negotiating with UNC in search of a compromise, revising records requests to narrow their scope, and in some cases filing multiple requests for the same records.

Ultimately, the Center was unsuccessful in obtaining a panoply of requested, mandatory compliance records from UNC. Requests to DEQ for the same records were similarly unsuccessful. Having exhausted its options for obtaining these records after two years of diligent searching, the Center concluded that the requested records were either never generated or never submitted to regulatory authorities. In some instances, the Center did obtain requested compliance records from UNC and DEQ, but those records did not demonstrate that all mandatory compliance activities had taken place.

2

The absence of the requested mandatory compliance records in UNC and DEQ's Public Records Act responses ultimately formed the basis, at least in part, for most of Conservation Groups' claims. In other instances, produced records which failed to demonstrate UNC's compliance with mandatory monitoring and reporting activities formed the basis, at least in part, for Conservation Groups' claims. On the whole, these missing or incomplete records formed the basis for at least part of the allegations in Claims I through VI, and VIII.

Furthermore, regarding Claim IX, UNC has admitted to a repeated, post-complaint violation of the relevant permit conditions in its Quarterly Emissions Report for the first quarter of 2020.[2] UNC's admission demonstrates that Claim IX's allegation of repeated violations was not only reasonably inferred and made in good faith, but was factually accurate. This revelation demonstrates why all of Conservation Groups' allegations of repeated violations should survive the motion to dismiss stage and proceed to discovery.

## **LEGAL BACKGROUND**

A. **Standard of Review**

UNC has a high burden to overcome in a Rule 12(b)(6) motion to dismiss. The court is required to accept as true all allegations of the plaintiffs and draw all reasonable inferences in plaintiffs' favor. *See, e.g., Grey v. Henderson*, 169 F. Supp. 2d 448, 450 (M.D.N.C. 2001) (*citing Martin Marietta Corp. v. Int'l Telecommunications Satellite*

---

[2] Conservation Groups will have to provide a new notice of intent to sue letter before adding this second calibration drift assessment claim to the case.

3

*Org.*, 978 F.2d 140, 142 (4th Cir. 1992)).  The law requires that a motion to dismiss for failure to state a claim should not be granted if the claim for relief is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Thus, to prevail, Defendant must prove that the Complaint pleads no facts allowing the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

Defendant also faces a high burden in order to prevail on a Rule 12(b)(1) motion, which may only be granted "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Evans v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir. 1999) (*quoting Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).  Although the burden of proof of jurisdiction rests with plaintiffs, for a motion under Rule 12(b)(1), a court must accept plaintiffs' factual allegations as true and draw all reasonable inferences from those allegations in plaintiffs' favor.  *N.C. Motorcoach Ass'n v. Guilford County Bd. of Educ.*, 315 F. Supp. 2d 784, 790 (M.D.N.C. 2004) (*citing Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).  As with a 12(b)(6) motion, plaintiffs' only burden is to properly plead their claims; they need not show the likelihood of prevailing.

The Supreme Court has ruled that in the context of Clean Water Act claims, good faith allegations of cognizable violations by plaintiffs are sufficient to sustain claims past the motion to dismiss phase of litigation: "§ 505 [of the Clean Water Act] confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of

4

continuous or intermittent violation . . . ." *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 64 (1987). The Supreme Court directed defendants wishing to challenge jurisdictional allegations to do so in a motion for summary judgment, explaining that plaintiffs need not offer "proof as a threshold matter in order to invoke the District Court's jurisdiction." *Id.* at 66. The Supreme Court's reasoning was based in part on the "'the practical difficulties of detecting and proving chronic episodic violations of environmental standards.'" *Id.* at 65. In other words, the Supreme Court recognized that discovery available under the Federal Rules of Civil Procedure is necessary to enable plaintiffs to prove a continuing violation.

While the *Gwaltney* Court analyzed claims brought under the Clean Water Act, its holdings are applicable to citizen suit claims brought under the CAA unless the plain language differs between the two. *Roosevelt Campobello Intern. Park Comm'n v. U.S. E.P.A.*, 711 F.2d 431, 437 (1st Cir. 1983) ("[I]n addition to similar statutory language, the 1972 Senate report on the Clean Water Act explicitly states that the citizen suit provision of [the Clean Water Act] was 'modeled on the provision enacted in the Clean Air Act.'") (*citing* S. Rep. No. 92-414, 92d Cong., 2d Sess., reprinted in 1972 U.S. Code Cong. & Ad. News 3668, 3745)).

## B. **Pleading Requirement for Repeated Violations**

UNC deploys multiple contradictory pleading standards for citizen suit enforcement actions in its Motion to Dismiss, sometimes suggesting that the CAA requires that violations must be ongoing, and at other times acknowledging that

violations must simply be repeated. *See, e.g.*, Dkt. #20 at 4-6. However, the Senate managers of the final version of the CAA stated: "[i]t is the intention of the conferees that citizens should be allowed to seek civil penalties against violators of the Act whenever *two or more violations* have occurred in the past." 136 Cong. Rec. S16,953 (daily ed., Oct. 27, 1990) (emphasis added).

Moreover, federal courts have repeatedly found that the 1990 amendments to the CAA overruled *Gwaltney*'s requirement for ongoing violations. Most recently, the Court of Appeals for the Fifth Circuit held that only alleging repeated violations is required to state a claim, and repeated means at least two violations:

> The [Clean Air] Act provides a cause of action—that is, a claim—only for repeated violations of a particular emission standard. 42 U.S.C. § 7604(a)(1); *Env't Tex.*, 824 F.3d at 518–19. That means a plaintiff must assert at least two violations of the same standard in order to allege a claim.

*Env't Tex. Citizen Lobby v. Exxonmobil Corp.*, No. 17-20545, 2020 U.S. App. LEXIS 24100, at *8-9 (5th Cir. Jul. 29, 2020).

A long line of federal court rulings has explicitly held that the CAA's 1990 amendments overruled the *Gwaltney* pleading requirement for ongoing violations with regards to CAA citizen suits:

> A plain reading of the CAA as amended, however, indicates that the 1990 Amendments overruled *Gwaltney* with respect to wholly past violations. The CAA, therefore, permits citizen suits for both continuing violations and wholly past violations, *so long as the past violation occurred more than once*. This interpretation has been accepted by several courts . . .

6

*Fried v. Sungard Recovery Servs., Inc.*, 916 F. Supp. 465, 467–68 (E.D. Pa. 1996) (emphasis added).  *See also, e.g.*, *United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1066 (S.D. Ohio 2001*) (citing Fried* approvingly); *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union*, No. CIV-04-438-F, 2005 WL 1389431, at *15–16 (W.D. Okla. June 10, 2005) (same); *New York v. Am. Elec. Power Serv. Corp.*, No. 2:04 CV 1098, 2006 WL 1331543, at *3 (S.D. Ohio Mar. 21, 2006) (same).

## C. **Clean Air Act**

The core purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(2).  Consistent with this goal, the Act requires EPA to establish health-based national ambient air quality standards ("NAAQS") for certain pollutants.  State air quality agencies that are delegated implementation authority under the Clean Air Act must develop and implement plans that include "applicable requirements," 40 C.F.R. § 70.2(1), the compliance with which advances maintenance and attainment of the NAAQS and other standards.  These applicable requirements are executed with respect to individual facilities through permitting programs established under Title V of the Act.  *See* 42 U.S.C. §§ 7410, 7661.

[Remainder of page left intentionally blank]

7

## ARGUMENT

### A. Claim I

In Claim I, Conservation Groups allege that Section 2.1.A of UNC's Title V permit "establishes a *limit* of 323.17 million British Thermal Units per hour ("mmBtu/hr") heat input capacity for each of UNC's two coal/natural gas/No. 2 fuel oil/wood fired circulating fluidized combustion boilers" Dkt. #17 at ¶34 (emphasis added). "Heat input is a measure of the amount of coal which is burned. The more coal that is burned, the more pollution emitted, all else being equal." *Id.*

Conservation Groups go on to allege that UNC repeatedly violated this limit and will continue to do so. Conservation Groups identify two specific instances, on December 17, 2014 and December 18, 2014, where UNC operated the relevant boilers above the 323.17 million Btu per hour limit. *Id.* at ¶35-36. Those two violations constitute "repeated" violations under the citizen suit provision. 136 Cong. Rec. S16,953 (daily ed., Oct. 27, 1990); *Fried*, 916 F. Supp. at 467–68. Conservation Groups also allege that "UNC has repeatedly exceeded the 323.17 mmBtu/hr limit for Boilers 6 and 7 on numerous other occasions since 2014 in violation of Section 2.1.A of UNC's air pollution permit and will continue to do so." *Id.* at ¶38.[3]

---

[3] UNC's assertion that the "Complaint does not allege any ongoing violations of the Act or the Permit," Dkt. #20 at 4, is not accurate. UNC inserted a period and deleted "and will continue to do so." out of its quote of paragraph 38 of the First Amended Complaint. Dkt. #20 at 8-9.

Defendant has not questioned that Conservation Groups' allegations of repeated violations of a limit in UNC's Title V permit were made in good faith or pointed to any reason to question the facial plausibility of these allegations. Therefore, Conservation Groups have alleged a claim for which relief can be granted. See section B, above (two violations constitute repeated violations under the citizen suit provision).

Defendant also urges the Court not accept as true Conservation Groups' allegation that Title V permit establishes a heat input limit of 323.17 million Btu per hour. Dkt. #20 at 9. To get around the requirement that the Court must accept the allegations in the complaint as true, UNC attaches its Title V permit. Dkt. #20-1, Ex. 1. However, UNC's argument ignores the plain language of its Title V permit and would cause an absurd result, which would endanger the health and very lives of the people exposed to UNC's pollution.

As with statutory interpretation, the plain language of permits to pollute is important. *See e.g.*, *Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, 845 F.3d 133, 139 (4th Cir. 2017) (*quoting Piney Run Pres. Ass'n v. Cty. Comm'rs*, 268 F.3d 255, 269 (4th Cir. 2001)). UNC claims that the 323.17 million Btu per hour in Condition 2.1.A "describes the emission sources subject to that section." Dkt. #20 at 8. But Condition 2.1.A is not labeled as a description. Rather, Section 1 of the Permit, which Conservation Groups do *not* rely upon, contains a provision which is explicitly labeled "Emission Source Description." Dkt. #20-1, Ex. 1 at Page 3. In that section, Boilers 6 and 7, which

9

are at issue in this claim, are assigned the identifiers ES-001 and ES-002 so that there can

be no confusion about what sources are being referred to in the rest of the permit.

Section 2, however, is entitled "Specific Limitations and Conditions." *Id.* at 10.

Section 2.1 states the emission sources listed below are "subject to the following specific

terms, conditions and limitations." *Id.* The following subsection, 2.1.A, contains the

323.17 million Btu per hour heat input limit that applies to ES-001 and ES-002. *Id.*

There is no need to identify ES-001 and ES-002 by the 323.17 million Btu per hour heat

input in Section 2.1.A because these units have their identifiers of ES-001 and ES-002.

Moreover, holding the 323.17 million Btu per hour heat input value is not an

enforceable limit would lead to an absurd result. *See generally United States v. Am.

Trucking Ass'ns*, 310 U.S. 534, 543 (1940) (courts interpret statutes to avoid absurd

results). A simplified example and then specific examples follow to demonstrate that not

having an enforced heat input limit is absurd.

There are three units of measurement relevant to this analysis: (1) an emission rate

expressed in pounds of pollution per million Btu of heat input, (2) the heat input

expressed million Btu per hour, (3) and another emission rate, this one expressed in

pounds of pollution per hour. The first multiplied by the second equals the third. The

third, pounds of pollution per hour, is the meaningful metric for environmental protection

because it reflects what is leaving the smoke stack and entering the air people breathe.

Most of the emission limits in UNC's Title V permit for ES-001 and ES-002 are

written as pounds of pollution per million Btu. *See e.g.* Dkt. #20-1 at Page 10 (listing

limits for particulate matter and sulfur dioxide). However, emission limits in pounds of pollution per million Btu heat input, by themselves, do nothing to ensure the Clean Air Act's purpose of protecting air quality. 42 U.S.C. § 7401(b)(2).

Indeed, a source can consistently comply with a limit on its pounds of pollution per million Btu heat input and still greatly increase its actual pollution leaving its smokestack. For example, a source with a one-pound-of-sulfur-dioxide per million Btu heat input limit that operates at one million Btu heat input will have emissions of one pound per hour. This is because pounds per million Btu times million Btu gives us the actual emissions in pounds per hour. However, if the source increases its heat input to two million Btu per hour, the source's emissions would double to two pounds per hour while still meeting the one-pound-of-sulfur-dioxide / million Btu heat input limit. *See* Dkt. #17 at ¶34 ("The more coal that is burned, the more pollution emitted, all else being equal."). It is the emissions in mass, that is, pounds per hour, which determines how much pollution is in the air we breathe. Only when a pound-per-heat input limit is coupled with a limit on the heat input itself can the amount of pollution from a source be controlled in a way that protects public health and the environment. In other words, UNC must control its heat input by limiting how much coal it burns per hour in order to meaningful control the amount of pollution it emits.

A reasonable inference that Conservation Groups are entitled to at this stage, and which they will prove at the summary judgment or trial stage, is that UNC relies on the fact they then will not exceed the 323.17 million Btu rate when attempting to demonstrate

that emissions from ES-001 and ES-002 will not cause unacceptable levels of pollution in the ambient air.  For example, on May 18, 2020, UNC submitted a "Revised Toxic Air Pollutant Air Dispersion Modeling Analysis" to DEQ, to demonstrate that its emissions do not cause unacceptable levels of toxic air pollutants in the ambient air.  The analysis used a computer model to predict ambient levels of pollutants.  One of the inputs to the model is the emission rate of such pollutants.  But that emission rate input into the model is the mass of the emissions, i.e. pounds per hour.  In order to determine that pounds per hour emission rate, UNC multiplied the 323.17 million Btu per hour heat input by the pounds per million Btu emission rate to get the pounds per hour emission rate to plug into the modeling.  But if the 323.17 million Btu heat input is not an enforceable limit, in reality UNC could emit more Toxic Air Pollutants than it input into the model.  This would render the modeling demonstration invalid and could result in ambient pollution levels above the levels regulators have deemed acceptable.

UNC has had to submit numerous such air dispersion modelling analyses of its emission impacts to ambient pollution levels over the years.  Almost all of them assume that ES-001 and ES-002 do not ever operate above 323.17 million Btu per hour.  If the 323.17 million Btu per hour heat input is not an enforceable limit, all of these attempts to demonstrate that UNC is not causing ambient pollution above the acceptable level are bogus and the public is endangered.

12

Conservation Groups have a pending discovery request for all of UNC's hourly heat input data. After Conservation Groups obtain this discovery, summary judgment or trial would be proper vehicles to resolve this issue.

## B. Claim II

UNC first argues that Claim II's allegation of repeated record-keeping violations falls short because Conservation Groups did not specify whether UNC's record-keeping failures were "absolute," intermittent, or ongoing at the time of filing. Dkt. #20 at 12. UNC seems to argue that *Iqbal* implicitly overruled *Gwaltney*'s holding that a citizen suit complaint need only make "good-faith allegation." *Gwaltney*, 484 U.S. at 64. Under the current configuration of the Clean Air Act's citizen suit provision, these good-faith allegations can be of past violations so long as they are repeated. 42 U.S.C. 7604(a)(1). As described in detail above, repeated means more than one violation. *See, e.g., Fried*, 916 F. Supp. at 467–68; 136 Cong. Rec. S16,953 (daily ed., Oct. 27, 1990).

Here, Conservation Groups pled repeated violations of 15A NCAC 02D.0501(c) and permit condition 2.2.A.1. Dkt. #17, ¶¶1, 40, 41. Because readiness testing of emergency generators could be conducted on any day, permit condition 2.2.A.1's mandate to maintain the required operational records is in effect on each day. As such, each day that UNC failed to maintain the required operational records is a separate, cognizable violation.

UNC next argues that allegations supporting Claim II are not specific enough. Dkt. #20 at 13. However, *Ashcroft v. Iqbal* simply requires that a claim is "plausible on

13

its face" and pleads sufficient factual allegations that, construed in the light most favorable to the plaintiffs, allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. 662, 678 (2009) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Tucker v. Chrysler Cred. Corp.*, 149 F.3d 1170 (Table), 1998 U.S. App. LEXIS 10803, at *5 (4th Cir. 1998). Much more than a "formulaic recitation" of the elements of a claim without further factual enhancement, Conservation Groups pled that UNC has admitted multiple failures to maintain the required records for the diesel-fired generator at Kenan Stadium (emission source ES-Gen-48). Dkt. #17, ¶41. The claim of failure is absolute.

The factual allegations pled in good faith are sufficient to allow the Court to reach the reasonable inference that UNC is liable for the alleged repeated violations. Accordingly, the Court should deny Defendant's motion with regards to Claim II.

## C. Claim III

Defendant argues that DEQ's issuance of a Notice of Violation ("NOV") letter for the inspection failures alleged in Claim III bars those claims. Dkt. #20 at 14. Unfortunately for Defendant, the CAA only prohibits citizen suits where a "[s]tate has commenced and is diligently prosecuting a civil action in a court of the United States or a State." 42 U.S.C. §7604(b)(1)(B). Defendant recognizes as much, stating: "the NOV is not in a court of the State of North Carolina" and characterizes it as a "prerequisite to any action in Court." Dkt. #20 at 15. This is not true in this case. UNC states the NOV "has been completely resolved". Dkt. #20 at 7. Thus, no state court action is coming.

14

In any event, an NOV letter does not constitute a state court enforcement action, and thus cannot trigger the citizen suit bar in question. 42 U.S.C. §7604(b)(1)(B); *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 795 (5th Cir. 2000) ("the plain meaning of 'court of the United States or a State' excludes administrative actions"); *WildEarth Guardians v. Lamar Utils. Bd.*, 2012 U.S. Dist. LEXIS 43307, at *5-7 (D. Colo. 2012) ("courts interpreting this provision have uniformly held that 'a civil action in court' means what it says—an action in a court").

Indeed, the case cited by Defendant in purported support of this argument does not hold that an agency enforcement action that is not an action in court is enough to bar a CAA citizen suit. Dkt. #20 at 15 (*citing Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 475 (6th Cir. 2004)). In *Ellis*, after plaintiffs sent their citizen suit notice letter to EPA, the government commenced an enforcement action in federal court and ultimately entered into a consent decree whereby defendants were subject to civil penalties, *id.* at 468; whether or not a plaintiff could commence a citizen suit despite government diligent prosecution was not even at issue. The CAA citizen suit provision could not be clearer: only the commencement *and* diligent prosecution of a civil action *in court* is enough to bar a citizen suit. 42 U.S.C. §7604(b)(1)(B). Potential commencement of a court action sometime in the future is not enough. In any event, Defendant points to N.C. Gen. Stat. §143-215.114, Dkt. #20 at 15, but an action under this statute would merely be a penalty collection action, not a diligent prosecution of Clean Air Act violations.

15

In a last-ditch effort to undermine Claim III, Defendant makes the radical call that the Court abstain from exercising its jurisdiction pursuant to the *Burford* doctrine. Dkt. #20 at 16. This call is radical because for nearly 200 years, there has been a rule which creates a "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River Water Conservation District v. U.S.*, 424 U.S. 800, 817-818 (1976). In the *Colorado River* case, the Supreme Court went on to explain: "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Id.* at 813.

Furthermore, Defendant's memorandum makes clear, by itself, that *Burford* abstention cannot be applied here. Defendant admits that *Burford* doctrine applies "[w]here timely and adequate state court review is available." Dkt. #20 at 16. Here, the state courts have no jurisdiction over the federal Title V claims at issue. North Carolina has not created a citizen suit provision.

Defendant's claim that Conservation Groups could challenge DEQ's NOV in a North Carolina Administrative Procedures Act case is a dubious proposition considering the doctrine of enforcement discretion. *See e.g. Heckler v. Chaney*, 470 U.S. 821, 837-838 (1985). In any event, Defendant's preference that this issue be resolved in a forum

16

where there is no expertise in federal law, no discovery, no civil penalties, and no injunctive relief is unsurprising, but irrelevant.

Defendant argues that the *Burford* doctrine applies when there are "difficult questions of state law," but acknowledges that this case is "pursuant to the citizen suit provision of the *Federal* Clean Air Act." Dkt. #20 at 1, 16. Nevertheless, Defendant requests that this federal Court abstain from deciding a case implementing a federal law. The Court should decline that request.

Ultimately, UNC's concerns over federal court interference with state enforcement amount to a quarrel with Congress, which created the citizen suit provision. In its wisdom, Congress saw fit to create citizen suit powers for the express purpose of disrupting state and federal governments' monopoly over enforcement of the CAA. The citizen suit provision plays an integral role in the remedial scheme of the CAA; it serves "to both goad the responsible agencies to more vigorous enforcement of the anti-pollution standards and, if agencies remain inert, to provide an alternative enforcement mechanism." *Baughman v. Bradford Coal Co., Inc.*, 592 F.2d 215, 218 (3d Cir. 1979). The Court should respect this scheme.

### D. <u>Claim IV</u>

As with Claims I, II, and II, Defendant contends that the Complaint includes insufficient facts to support allegations of repeated failures to inspect coal silo ductwork. Dkt. #20 at 17–18. On the contrary, Conservation Groups have identified the specific facts that form the basis for their allegations:

17

> UNC failed to perform monthly external visual inspections of the system ductwork and material collection unit for Coal Silo #1 Bin Vent Filter (ID No. CD-011) from June through December of 2016. Furthermore, UNC failed to perform monthly external visual inspections of the system ductwork and material collection unit for Coal Silo #2 Bin Vent Filter (ID No. CD-012) during March and October of 2016.

Dkt. #17, ¶45. When accepted as true and construed in the light most favorable to Conservation Groups, these facts allow for the reasonable inference that Claim IV is plausible on its face, and that Defendant is liable for the unlawful conduct alleged. *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, at 217–18 (4th Cir. 1994); *Iqbal*, 556 U.S. at 678.

Defendant does not dispute that Conservation Groups' allegations were pled in good faith. *Gwaltney*, 484 U.S. at 64. Indeed, UNC should understand full well the bases for the allegations because it admitted a violation of the relevant permit condition in correspondence with Conservation Groups and provided the very records that demonstrate noncompliance in response to the Center's Public Records Act requests.

### E. Claim V

As it did for Claim IV, Defendant contends that the Complaint includes insufficient facts to support allegations of repeated failures to maintain logbooks for daily coal ash system visual inspections. Dkt. #20 at 18–20. For this claim, Defendant seeks to have Conservation Groups prove a negative—*i.e.*, UNC's failure to perform inspections—in the absence of discovery. *Id.* at 19. Nonetheless, Conservation Groups have identified the specific facts that form the basis for their allegations. Specifically, the Complaint alleges that UNC did not maintain the required logbooks each day between

18

January 1, 2018 and November 29, 2018. Dkt. #17, ¶47. When accepted as true and construed in the light most favorable to Conservation Groups, these facts allow for the reasonable inference that Claim V is plausible on its face, and that Defendant is liable for the unlawful conduct alleged. *Estate Constr. Co.*, 14 F.3d at 217–18; *Iqbal*, 556 U.S. at 678.

Moreover, the allegations supporting Claim V were pled in good faith. *Gwaltney*, 484 U.S. at 64. The Center filed multiple Public Records Act requests with UNC and DEQ in order to obtain the relevant logbook records, however no such records were produced. These omissions in UNC's and DEQ's responsive productions gave rise to the good faith belief that no such records existed.

## F.  Claim VI

Defendant calls for the dismissal of Claim VI because the Complaint identifies only one specific instance of a violation. But the violation is of a monthly requirement, Dkt. #17 at ¶50, which means it comprises thirty-one violations for each day of the month. *See PIRG v. Star Enterprise*, 771 F. Supp. 655 (D. N.J. 1991) and cases gathered therein. While these cases deal with violations of Clean Water Act requirements measured via monthly averaging, the once-a-month inspection requirement for UNC exists to ensure that UNC's equipment is working properly to ensure no excessive emissions during the month. Failing to conduct the inspection removes the assurance of a lack of excessive emissions for the entire month.

19

In any event, contrary to Defendant's assertion, Conservation Groups brought good faith allegations of "repeated violation[s] of 15A NCAC 02D.0515 and Permit condition 2.1.E.1.d and/or permit condition 2.1.E.1.c." Dkt. #17, ¶50. Those allegations are based on documents produced by UNC that show the lack of any record of the requisite inspection of coal ash system ductwork in October 2016, and on the fact that UNC has failed to produce all relevant records in response to the Center's Public Records Act requests. Only after a full opportunity to obtain discovery will the question of whether the failure to conduct the requisite inspection and maintain a log of it in October 2016 was an isolated incident or part of a larger pattern be answered. Given their good faith allegations and viewing those in the light most favorable to Conservation Groups, Defendant's motion to dismiss Claim VI should be denied and its arguments heard at the summary judgment stage. *Estate Constr. Co.*, 14 F.3d at 217–18; *Gwaltney*, 484 U.S. at 64; *Grey*, 169 F. Supp. 2d at 450; Fed. R. Civ. P. 56(b).

## G. Claim VII

Defendant brings two arguments in favor of dismissal of Claim VII. First, it suggests that the only way to prove a violation of the carbon monoxide permit condition is to show that UNC exceeded its 30-day average of 133 parts per million (of air) by volume, dry ("ppmvd"). Dkt. #20 at 21. However, Defendant's description of the relevant permit condition is incomplete. The permit condition for carbon monoxide emissions for the coal-fired Boilers 6 and 7 is 133 ppmvd, corrected to 7% oxygen. Dkt. #20-1 at 10-11, 14. Because UNC's December 2014 Emissions Test Report for Boilers 6

20

and 7 reported carbon monoxide emissions from Boilers 6 and 7 corrected to 15% oxygen, UNC failed to demonstrate compliance with permit condition 2.1.A.4.b.

In the alternative, Defendant argues that Claim VII should be dismissed because Conservation Groups failed to allege repeated violations. On the contrary, the Complaint includes the good faith allegation that "UNC is in repeated violation of permit condition 2.1.A.4.b." Dkt. #17, ¶52. As explained above, that is sufficient.

## H. <u>Claim VIII</u>

Defendant argues that it need not report permit violations to state regulatory authorities pursuant to permit condition 3.I.A.3.a. if those violations do not form the basis of a cognizable claim per the *Iqbal* pleading standard. Defendant's reasoning is strained and inapposite. *Iqbal*'s referenced holding pertains to the pleading standard for complaints pursuant to Rule 8(a)(2) and has no bearing on the definition of permit deviations under permit condition 3.I.A.3.a. Permit condition 3.I.A.3.a. required UNC to notify the North Carolina Division of Air Quality ("DAQ") of all permit deviations described in Claims I through VII in a written, certified, quarterly report, irrespective of any potential future court action. Dkt. #20-1 at 56.

Secondly, Defendant argues that the Court should dismiss Claim VIII, which alleges UNC failed to annually notify DAQ and EPA of the permit violations identified in Claims I through VII because they are not "federally enforceable." This is wrong. The Title V permit regulations make clear that all Title V permit deviations are indeed federally enforceable: "[a]ll terms and conditions in a [Title V] permit, including any

21

provisions designed to limit a source's potential to emit, are enforceable by the Administrator and citizens under the Act." 40 CFR 70.6(b)(1). Likewise, the Clean Air Act's citizen suit provision provides that any person may commence a civil action in federal court against any person who is alleged to have repeatedly violated, or to be in violation, of any "emission standard or limitation." 42 U.S.C. § 7604(a)(1). The Clean Air Act defines "emission standard or limitation" to include "any other standard, limitation, or schedule established under any permit issues pursuant to subchapter V of this chapter . . . , [and] any permit term or condition." 42 U.S.C. § 7604(f)(4). Furthermore, UNC's Title V permit itself provides in Section 3.A.5 that ". . . all terms and conditions contained herein shall be enforceable by the DAQ, the EPA, and citizens of the United States as defined in the Federal Clean Air Act."

Because each of Claims I through VII involve deviations from UNC's Title V permit, all of these claims allege "federally enforceable" violations that required annual reporting to DAQ and EPA. Therefore, Defendant's motion to dismiss Claim VIII should be denied.

## I. <u>Claim IX</u>

Defendant calls for the dismissal of Claim IX because the Complaint identifies only one specific instance of a violation. Conservation Groups' good faith allegations of repeated violations of 15A NCAC 02D.0524, permit conditions 2.1.B.1.c, 2.1.B.2.e, and 40 CFR Part 60, Appendix F, Quality Assurance Procedure 1 are sufficient to move beyond a motion to dismiss and into discovery, as explained above. Dkt. #17, ¶¶1, 58.

22

Furthermore, UNC has admitted to a repeated, post-complaint violation of the relevant permit conditions in its Quarterly Emissions Report for the first quarter of 2020. Accordingly, Claim IX should survive the motion to dismiss stage and proceed to discovery.

## J.  **Claim X**

Defendant argues that Claim X should be dismissed for failure to allege repeated violations.  This is inaccurate.  The Complaint explicitly alleges repeated violations of 15A NCAC 02D.0501(c) and permit condition 2.2.A. under Claim X.  Dkt. #17 ¶¶1, 62. In addition, Claim X involves at least two emission sources that were in violation of 15A NCAC 02D.0501(c) and permit condition 2.2.A.  The simultaneous operation of each of these pieces of equipment constituted at least two separate violations.  Furthermore, Claim X alleges violations of 15A NCAC 02D.0501(c) and permit condition 2.2.A. in addition to the violations of those requirements identified in Claim II.  Only two violations are required to constitute a "repeated" violation under the CAA.  *Fried*, 916 F. Supp. at 467–68.  Therefore, Defendant's motion to dismiss Claim X should be denied. *Gwaltney*, 484 U.S. at 64; *Grey*, 169 F. Supp. 2d at 450.

## CONCLUSION

All of Conservation Groups' claims were sufficiently pled to survive the motion to dismiss.  We respectfully urge this Court to deny Defendant's motion to dismiss and to allow Conservation Groups to complete to discovery before issuing a ruling on the merits.

Dated: August 13, 2020                    Respectfully submitted,

                                          */s/ Perrin W. de Jong*
                                          Perrin W. de Jong
                                          Staff Attorney
                                          Center for Biological Diversity
                                          P.O. Box 6414
                                          Asheville, NC 28816
                                          (828)774-5638
                                          perrin@biologicaldiversity.org

                                          Robert Ukeiley[4]
                                          Senior Attorney
                                          Center for Biological Diversity
                                          1536 Wynkoop St., Ste. 421
                                          Denver, CO 80202
                                          (720) 496-8568
                                          rukeiley@biologicaldiversity.org

                                          Bridget M. Lee[5]
                                          Senior Attorney
                                          Sierra Club
                                          9 Pine Street, Suite D
                                          New York, NY 10005
                                          (845) 323-5493
                                          bridget.lee@sierraclub.org

                                          *Counsel for Center for Biological Diversity and Sierra Club*

---

[4] Pursuant to LR83.1(d) Robert Ukeiley, a member in good standing of the bar of the Colorado Supreme Court, appears by special appearance in association with Perrin de Jong, a member of the bar of this Court.

[5] Pursuant to LR83.1(d) Bridget Lee, a member in good standing of the bar of the Court of Appeals of New York, appears by special appearance in association with Perrin de Jong, a member of the bar of this Court.

## CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 7.3(d), the undersigned counsel certifies that this Response contains 6,040 words, excluding the parts that do not count towards the limitation as provided in Local Rule 7.3(d)(1).

Dated:  August 13, 2020.

*/s/ Perrin W. de Jong*

Perrin W. de Jong
P.O. Box 6414
Asheville, NC 28816
perrin@biologicaldiversity.org
Telephone: (828)774-5638

*Counsel for the Plaintiffs*

25

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on counsel for Defendant via the Court's ECF system.

This the 13th day of August, 2020.

   /s/ Perrin W. de Jong
Perrin W. de Jong N.C. Bar No. 42773
Center for Biological Diversity
P.O. Box 6414
Asheville, NC 28816
Telephone: (828)252-4646
Email: perrin@biologicaldiversity.org

*Attorney for the Plaintiffs*

26