# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:19-cv-1179-CCE-JLW

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, | ) ) ) | |
| Plaintiffs, | ) ) ) | **MEMORANDUM IN SUPPORT OF** |
| v. | ) ) | **PLAINTIFFS' MOTION FOR** **SUMMARY JUDGMENT** |
| UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, | ) ) ) | **AS TO LIABILITY** Fed. R. Civ. P. 56 |
| Defendant. | ) ) | |
| _____ | ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. iii

GLOSSARY OF ACRONYMS ........................................................................................ vi

NATURE OF MATTER .................................................................................................... 1

FACTS ............................................................................................................................... 1

JURISDICTION AND NOTICE ....................................................................................... 2

STANDING ....................................................................................................................... 3

QUESTIONS PRESENTED .............................................................................................. 7

LEGAL BACKGROUND ................................................................................................. 8

    I.   Clean Air Act ....................................................................................................... 8

    II.  UNC's Title V Permit ......................................................................................... 9

    III. Citizen Enforcement ......................................................................................... 10

SUMMARY JUDGMENT STANDARD .......................................................................... 11

ARGUMENT .................................................................................................................... 11

    I.   Pollution Control Violations .............................................................................. 12

        A.  Claim I: Violations of the Heat Input Limit for Boilers 6 and 7 .......................... 12

        B.  Claim IX: Readiness Testing Running Conflicts ................................................ 18

    II.  Failure to Monitor Emissions ............................................................................ 19

        A.  Claim V: Failure to Perform Daily Visible Emissions Inspections for Coal Ash Handling, Storage, and Loading System .................................................... 19

    III. Failure to Inspect Pollution Control Equipment ............................................... 20

        A.  Claim III: Failure to Annually Inspect Air Cleaners for Emergency Diesel Generators .................................................................................................... 20

        B.  Claim IV: Failure to Inspect Monthly Particulate Matter Pollution Control Equipment for Coal Handling, Conveying, Crushing, and Storage System ............... 21

        C.  Claim VI: Failure to Inspect Monthly Pollution Control Equipment for Coal Ash Storage Silo .............................................................................................. 24

    IV. Failure to Maintain Pollution Monitoring Equipment ...................................... 25

        A.  Claim VIII: Failure to Perform Daily Calibration Drift Assessments on Continuous Emission Monitoring System ................................................... 25

i

**V.  Failure to Maintain and Submit Compliance Records** ..................................... **28**

    A.  Claim II: Failure to Keep Readiness Testing Records ......................................... 28

**VI.  Failure to Notify State and Federal Regulators of Title V Permit Violations** . 29

    **A.  Claim VII: Violations of Compliance Reporting Requirements** ....................... **29**

       1. Quarterly Reporting Violations .............................................................. 29

       2. Annual Certification Violations .............................................................. 32

**CONCLUSION** ......................................................................................................... 34

**CERTIFICATE OF COMPLIANCE** ...................................................................... 36

**CERTIFICATE OF SERVICE** ................................................................................ 37

# TABLE OF AUTHORITIES

## CASES

*Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003)…………..4,6

*Arizona v. California,* 460 U.S. 605, 618 (1983)…………………………………………..14

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)……………………………………11

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988)……………13

*Env't Tex. Citizen Lobby v. Exxonmobil Corp.,*
        824 F.3d 507, 519-520 (5th Cir. 2016) …………………………………………17

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000)…………………………………………………………………………………7

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
        528 U.S. 167, 182-83 (2000)………………………………………………….4,7

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977)…………………6

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992)……………………………….4

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 17 (1981)..1

*Nat. Res. Def. Council*, *Inc. v. Outboard Marine Corp.*, 702 F. Supp. 690, 692-93 (N.D. Ill. 1988)……………………………………………………………………………17

*N.C. ex rel. Copper v. Tenn. Valley Auth.*, 593 F.Supp.2d 812, 822 (W.D.N.C. 2009)….2

*PIRG v. Star Enterprise*, 771 F. Supp. 655 (D. N.J. 1991)……………………..………23

*Sierra Club v. Simkins Industries*, 617 F. Supp. 1120, 1128 (D. Md. 1985)……………17

*Sierra Club v. Simkins Indust., Inc.*, 847 F.2d 1109, 1112-16 (4th Cir. 1988)…………..23

*Sierra Club v. Union Oil*, 813 F.2d 1480, 1491-1492, (9th Cir. 1987)…………………16

*Stoddard v. W. Carolina Reg'l Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir. 1986)…..…11

iii

*Student Pub. Interest Grp. of N.J. v. Tenneco Polymers*, *Inc.*, 602 F. Supp. 1394, 1400 (D.N.J. 1985)……………………………………………………………………………..17

*United States v. Aluminum Co. of Am.*, 824 F. Supp. 640, 648-49 (E.D. Tex. 1993)……17

*United States v. B & W Inv. Props.*, 38 F.3d 362, 367 (7th Cir. 1994)…………………..11

*United States v. Dell'Aquilla*, 150 F.3d 329, 332 (3d Cir. 1998)………………………..10
*Wrath v. Seldin*, 422 U.S. 490, 511 (1975)………………………………………………….6

## STATUTES

28 U.S.C. § 1331 ................................................................................................................2

28 U.S.C. § 2201 ................................................................................................................3

28 U.S.C. § 2202 ................................................................................................................3

42 U.S.C. § 7401…………………………………………………………………………8

42 U.S.C. § 7410 ...............................................................................................................9

42 U.S.C. § 7413 ...............................................................................................................3

42 U.S.C. § 7604…………………………………………………………………...1,2,3,10

42 U.S.C. § 7661 ...............................................................................................................9

42 U.S.C. § 7661a…………………………………………………………………………9

42 U.S.C. § 7661c…………………………………………………………………………9

## REGULATIONS

40 C.F.R. § 54.2.................................................................................................................3

40 C.F.R. Part 60, Appendix B………………………………………………………25,26,27

40 C.F.R. Part 60, Appendix F………………………………..…………………17,25,26,27

40 C.F.R. § 70.2…………………………………………………………………………..9

iv

40 C.F.R. § 70.6(a)(1)……………………………………………………………9

40 C.F.R. § 70.6(b)(1) …………………………………………………………...32

40 C.F.R. Part 75, Appendix F, Section 5.5.3.2
…………………………………...1715A NCAC 02D.0501
…………………………………………………………..28,29

15A NCAC 02D.0515…………………………………………………21,22,23,24,25

15A NCAC 02D.0521………………………………………………………..19, 20

15A NCAC 02D.0524………..……………………………………………25,26,27

15A NCAC 02D.0535………………………………………………………………29

15A NCAC 02D.1111…………………………………………………………..20, 21

**OTHER FEDERAL AUTHORITIES**

Fed. R. Civ. P. 56(**a**)…………………………………………………………11

Case 1:19-cv-01179-CCE-JLW   Document 45   Filed 04/14/21   Page 6 of 44

## GLOSSARY OF ACRONYMS

CEMCR       Continuous Emissions Monitoring Compliance Requirement

DAQ          North Carolina Department of Environmental Quality, Division of Air Quality

EER           Excess Emission Reports

EPA           United States Environmental Protection Agency

ES             Emissions Source

mmBtu       Million British Thermal Units

RFA           Request for Admission

UNC           The University of North Carolina at Chapel Hill

## NATURE OF MATTER

Plaintiffs Center for Biological Diversity and Sierra Club (collectively, "Conservation Groups") seek to require the University of North Carolina at Chapel Hill ("UNC") to comply with its permit obligations under Title V of the Clean Air Act and to stop unlawful pollution of the air. The facts in this case come from UNC itself. UNC's own monitoring records and testimony prove that the university has burned more coal than its permit allows in its coal burning boilers, has operated its polluting equipment in a manner that can cause violations of health- and public welfare-based national ambient air quality standards, and failed to meet its other pollution control permit obligations on thousands of occasions since December 2014.

The citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604, allows the Conservation Groups to enforce the Clean Air Act, including UNC's air pollution permit, as "private attorneys general." *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 17 (1981) (Addressing the Clean Water Act's very similar citizen suit provision). The citizen suit "provides no incentives to suit other than to protect the health and welfare of those suing and others similarly situated." *Id.* at 17, n.27.

## FACTS

UNC operates numerous air pollution sources regulated under Title V of the Clean Air Act on its flagship campus in Chapel Hill, North Carolina. P. Ex. 4 at 7-13. Between December 3, 2014 and the present day, UNC has violated its Title V permit over eight

thousand times at its coal burning boilers, its coal ash storage system, its coal handling, conveying, and storage system, and at its diesel and fuel oil generators. *See* Claims I-IX, *infra*. In violation of its Title V permit and applicable law, UNC has burned more coal than the permit allows in its coal-burning boilers, has operated its polluting equipment in a manner that can cause violations of health- and public welfare-based National Ambient Air Quality Standards, and has violated other air pollution control permit requirements. These diverse and long-standing Clean Air Act violations will continue indefinitely without the intervention of the Court. *Id.*

The air pollution that UNC emits can cause a wide variety of adverse impacts including asthma attacks, decreased lung function, especially among young people, and even premature mortality. *See, e.g.*, *N.C. ex rel. Copper v. Tenn. Valley Auth.*, 593 F.Supp.2d 812, 822 (W.D.N.C. 2009) *rev'd on other grounds*, 615 F.3d 291 (4th Cir. 2010) (finding "that, at a minimum, there is an increased risk of incidences of premature mortality in the general public associated with [air pollution] exposure").

## JURISDICTION AND NOTICE

This Court has jurisdiction over this Clean Air Act citizen suit pursuant to 42 U.S.C. § 7604(a)(3) ("The district courts shall have jurisdiction without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, . . . and to apply any appropriate civil penalties") and 28 U.S.C. § 1331 (federal question statute). This action seeks injunctive and declaratory relief and

civil penalties, as authorized by 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 7413, 7604(a).

This Court has jurisdiction over this citizen suit because Conservation Groups have alleged "repeated" violations for each claim. The Clean Air Act extends citizen suit jurisdiction to claims involving repeated violations, regardless of whether the violations are ongoing. *See* Oct. 21, 2020 Order [Dk.#30] at 2-3. The Clean Air Act requires only that at least two violations of the same standard be established. *Id.* Conservation Groups establish below at least two violations for each of Claims I through IX.

In compliance with 42 U.S.C. § 7604(b) and 40 C.F.R. § 54.2, on September 17, 2019, February 24, 2020, and September 15, 2020, the Conservation Groups gave UNC, the Administrator of the U.S. Environmental Protection Agency ("EPA"), and the North Carolina Department of Environmental Quality, Division of Air Quality ("DAQ"), notice of the Conservation Groups' intent to sue UNC for all of the violations specified in the Second Amended Complaint.

More than 60 days elapsed between the dates that UNC received the Conservation Groups' notice of intent to sue letters and the dates that Conservation Groups filed their Complaints, Dkt. #1, First Amended Complaint, Dkt. #17, and Second Amended Complaint, Dkt. #33.

## STANDING

To demonstrate Article III standing, a plaintiff must show an "injury-in-fact" which is "fairly traceable" to the defendant's conduct and which is "likely to be redressed

3

by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992). The injury-in-fact alleged must be "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560.

*Injury-in-Fact*

Plaintiffs have suffered an "injury-in-fact" where they have used the affected area and have had their aesthetic and recreational enjoyment of the area lessened by "reasonable concerns" stemming from knowledge of permit violations. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 182-83 (2000); *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity") (citations omitted).

Sonia Saper Desai is an active member of Plaintiff Center for Biological Diversity, and Bridget Karen Farrell is a member of both Plaintiff Center for Biological Diversity and Plaintiff Sierra Club. Desai Decl. ¶ 2; Farrell Decl. ¶¶ 2-3. Both Desai and Farrell live, work, and recreate extensively in the UNC and Chapel Hill areas. Desai Decl. ¶¶ 1 ("I have lived in the Chapel Hill/Carrboro community for 19 years), 3 ("I spend 95 percent of my time living in and moving throughout the Chapel Hill/Carrboro community. I regularly spend time exercising outdoors on and nearby UNC-Chapel Hill's campus"), 4 ("I frequent the Weaver Street Market in downtown Carrboro

4

approximately four times per week . . . visit UNC's campus an average of once a week . . . visit or bicycle through the downtown area of Franklin Street in Chapel Hill an average of once a week . . . [and] also regularly walk and hike in the town of Carrboro."); Farrell Decl. ¶¶ 1, 4, 6. Farrell additionally has a son who is a student at UNC. *Id.* ¶ 7.

Desai and Farrell have reasonable concerns that their health and safety are compromised when UNC violates its Title V permit, causing injuries-in-fact to their recreational, aesthetic, and environmental interests. Desai Decl. ¶¶ 7-10; Farrell Decl. ¶¶ 7-11. In particular, Desai suffers from asthma, which causes her to "refrain from participating in social events and physical activities outdoors on bad air quality/high ozone/high particulate matter days," which accordingly has "restricted [her] growth and well-being economically, socially, intellectually, psychologically, and spiritually because the air quality is unsafe." *Id.* ¶ 7. Similarly, Farrell suffers from chronic migraine headaches that began when she moved to Chapel Hill in 2013 and is concerned her migraine symptoms are "connected to air quality problems in Chapel Hill"; because Farrell "frequently exercise[s] and spend[s] time outside" it is important to her to know that the air is as clean as possible, "especially given the relationship [she] noticed between [her] migraine headaches and spending time outdoors in the Chapel Hill area." Farrell Decl. ¶ 8, 11.

*Traceability and Redressability*

In order to satisfy the traceability requirement, "a plaintiff 'must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries

alleged' in the specific geographic area of concern." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 520 (4th Cir. 2003) (citation omitted) (quoting *Nat. Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 (4th Cir. 1992). Both Desai and Farrell do so. Because her "acute asthma symptoms remain a significant health issue," Desai is "personally harmed" by UNC's coal plant "operating in a way that violates the Clean Air Act," and conversely UNC's compliance with its Title V permit and resulting improvements in "its pollution control practices" would result in cleaner air that would "trigger fewer—and less severe—asthma attacks," enabling her to "enjoy my bicycle rides, walks, hikes, and runs much more." Desai Decl. ¶ 8; *see also id.* ¶¶ 9-12. Similarly, Farrell has "a recreational and personal health interest in having UNC's pollution control violations remedied" and would have a peace of mind interest in knowing "Chapel Hill's air has been relieved from any illegal pollution . . . and that all permit requirements are being met" if UNC were required to cease violating its Title V permit. Farrell Decl. ¶ 11; *see also id.* ¶¶ 10, 12-14. As such, Conservation Groups' standing witness members fully satisfy the requirements of Article III standing.

*Organizational Standing*

An organization may have standing to bring the claims of its members, even when the organization itself has not suffered an injury. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977); *see also Wrath v. Seldin*, 422 U.S. 490, 511 (1975) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."). An organization has representational standing when (1)

6

its members would have standing to sue in their own right, (2) "the interests at stake are germane to the organization's purpose," and (3) neither the claim asserted, or the relief requested requires the participation of the members being represented in the action. *Laidlaw*, 528 U.S. at 180.

Desai is a member of the Center for Biological Diversity and Farrell is a member of the Center for Biological Diversity and of the Sierra Club; both would additionally have standing to sue in their own rights. *See* Desai Decl. ¶ 2; Farrell Decl. ¶¶ 2-3. This action is, moreover, germane to the purposes of Conservation Groups. *See* Desai Decl. ¶ 2 (describing the organizational purpose of the Center for Biological Diversity); Farrell Decl. ¶¶ 2-3 (describing the organizational purposes for both the Center for Biological Diversity and the Sierra Club, respectively). Similarly, this action does not require individual members to participate; accordingly, Conservation Groups have organizational standing to bring this action. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000).

## QUESTIONS PRESENTED

1. Did UNC violate its heat input limit in its Title V permit by repeatedly running two boilers in excess of that limit?

2. Did UNC violate permit conditions by repeatedly running too many pollution sources concurrently?

3. Did UNC violate permit conditions by repeatedly failing to assure compliance with particulate matter emission controls for its coal and coal ash handling, storage, and loading systems?

4. Did UNC violate permit conditions by repeatedly failing to inspect the air cleaners on its eighty-two diesel-fired emergency generators?

5. Did UNC violate permit conditions by repeatedly failing to maintain operational records sufficient to demonstrate that emergency generators were only run when other pollution sources on campus were not running?

6. Did UNC violate permit conditions by repeatedly failing to conduct a monthly inspection of the coal ash silo bagfilter?

7. Did UNC violate permit conditions by repeatedly failing to maintain pollution monitoring equipment for its boilers via calibration drift assessments?

8. Did UNC violate permit conditions by repeatedly failing to report its deviations from permit limits, terms, and conditions to DAQ and EPA?

## LEGAL BACKGROUND

### I.    Clean Air Act

The core purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1).  Consistent with this goal, the Clean Air Act requires EPA to establish public health and welfare-based National Ambient Air Quality Standards for certain pollutants.  State air quality agencies such as DAQ are delegated implementation

authority under the Clean Air Act and must develop and implement plans that include "applicable requirements," 40 C.F.R. § 70.2, the compliance with which advances maintenance and attainment of the National Ambient Air Quality Standards and other standards. These applicable requirements are applied to individual facilities through a permitting program established under Title V of the Clean Air Act. *See* 42 U.S.C. §§ 7410, 7661.

## II.  UNC's Title V Permit

Major stationary sources of air pollution cannot operate except in compliance with an air pollution permit issued pursuant to Title V of the Clean Air Act. 42 U.S.C. § 7661a(a). Such permits "shall include enforceable emission limitations and standards . . . and such other conditions as are necessary to assure compliance with applicable requirements of this chapter, including the requirements of the applicable implementation plan." 42 U.S.C. § 7661c(a); *see also* 40 C.F.R. § 70.6(a)(1). DAQ issues Title V air pollution permits for individual facilities that include enforceable emission limitations and standards necessary to assure those facilities' compliance with all applicable requirements. 42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6(a)(1). UNC's Title V facilities are currently regulated under Permit No. 03069T35.

UNC has operated its major stationary sources of air pollution under four different Title V permits over the period of time that Conservation Groups allege permit deviations by UNC in this action. On September 10, 2014, DAQ issued UNC's Air Quality Permit No. 03069T32. P. Ex. 1 at 1. On November 9, 2014, DAQ issued UNC's Air Quality

9

Permit No. 03069T33.  P. Ex. 2 at 1.  On June 16, 2016, DAQ issued UNC Air Quality

Permit No. 03069T34.  P. Ex. 3 at 1.  On March 22, 2018, DAQ issued UNC Title V Air

Quality Permit No. 03069T35.  P. Ex. 4 at 1.  Permits 03069T32, 03069T33, 03069T34

and 03069T35 shall herein be collectively referred to as "UNC's air pollution permit," or

"Permit."

### III.    Citizen Enforcement

The Clean Air Act's citizen suit provision provides that any person may

commence a civil action against any person who is alleged to have violated (if there is

evidence that the alleged violation has been repeated) or to be in violation of any

"emission standard or limitation."  42 U.S.C. § 7604(a)(1).  The Clean Air Act defines

"emission standard or limitation" to include "any other standard, limitation, or schedule

established under any permit issued pursuant to subchapter V [of this chapter] . . . [and]

any permit term or condition."  42 U.S.C. § 7604(f)(4).

Thus, all of the standards, limitations, terms and conditions of UNC's air pollution

permit are enforceable through a Clean Air Act citizen suit.  Furthermore, UNC's air

pollution permit itself provides in Section 3.A.5. that "all terms and conditions contained

herein shall be enforceable by the DAQ, the EPA, and citizens of the United States as

defined in the Federal Clean Air Act."

The Clean Air Act citizen suit provision imposes strict liability on a defendant.

*See United States v. Dell'Aquilla*, 150 F.3d 329, 332 (3d Cir. 1998) (stating that "[t]he

Clean Air Act imposes strict liability on owners and operators who violate the Act");

10

*United States v. B & W Inv. Props.*, 38 F.3d 362, 367 (7th Cir. 1994) (same). *See also*

*Stoddard v. W. Carolina Reg'l Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir. 1986) (Clean

Water Act citizen suit, with language almost exactly the same as Clean Air Act, imposes

strict liability). Thus, the Conservation Groups need only prove that any standard,

limitation, or schedule established under UNC's Title V permit or any permit term or

condition was violated in order prevail.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). At summary judgment, "[t]he moving party is 'entitled to

a judgment as a matter of law' [when] the nonmoving party has failed to make a

sufficient showing on an essential element of her case with respect to which she has the

burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The nonmoving

party "may not rest on mere allegations, denials, or unsupported assertions." *Volumetrics*

*Med. Imaging, Inc. v. ATL Ultrasound, Inc.*, 243 F. Supp. 2d 386, 399 (M.D.N.C. 2003).

## ARGUMENT

There is no genuine dispute as to any material fact regarding the repeated Title V

permit violations in any of the below claims. Therefore, Conservation Groups are

entitled to judgment as a matter of law.

Case 1:19-cv-01179-CCE-JLW   Document 45   Filed 04/14/21   Page 18 of 44

## I.  Pollution Control Violations

### A.  Claim I: Violations of the Heat Input Limit for Boilers 6 and 7

UNC's Boilers 6 and 7, which are also sometimes referred to as Emission Sources ("ES") 001 and 002, respectively, burn coal and other fuels to produce steam and electricity.  Condition 2.1.A of the Permit limits the amount of coal and other fuel that can be burned in Boilers 6 and 7 to 323.17 million British Thermal Units ("mmBtu") per hour.  P. Ex. 4 at 14; Oct. 21, 2020 Order [Dk.#30] at 3-4.

By way of background, British Thermal Units ("Btu") is a measure of the energy content of a substance, such as coal or natural gas.  Energy content and heat content are synonymous terms in this context.

A more familiar unit for measuring the energy content of a substance is calories.  Calories are just another unit for measuring energy content, just like miles and kilometers are two different units for measuring distance.  One can convert Btus to calories.  1 Btu equals approximately 252 calories.[1]

So, for example, a 16-ounce bottle of soda has 140 calories.  One could convert the measurement unit, using the conversion calculator in footnote 1, and say the 16-ounce bottle of soda contains 0.555 Btus.  Because 16 ounces is a pound, one could also say soda contains 0.555 Btu per pound (Btu/lb).  If an individual consumes two 16-ounce bottles of soda per hour and consumed nothing else, one would be consuming 1.11

---

[1] *See Convert Calorie to British Thermal Unit* (2021), https://www.convertunits.com/from/calorie/to/Btu.  Plaintiffs only offer this web page to help explain the concept of what an mmBtu is, not as evidence.  In any event, the Court could take judicial notice that 1 Btu equals 252.056 calories as it is a fact not subject to reasonable dispute.

Btu/hour.[2]  That 1.11 Btu/hour would provide the energy for one to go about their tasks such as walking and talking.

Boilers 6 and 7 consume energy via burning, coal, natural gas, and No. 2 fuel oil, rather than bottles of soda.  The Permit limits the amount of fuel which can be burned per hour to 323.17 million Btu per hour (mmBtu/hr).[3]  This is a limit known as the heat input limit but more accurately it is a limit on the heat producing content of the fuels put into the boiler.  The amount of pollution from Boilers 6 and 7 increases as more mmBtus per hour of fuel are burned, if all other factors are held constant.

One final background fact to consider is that coal is not as homogenous as soda. Thus, while each one-pound bottle of soda contains 140 calories, the heat content of a pound of coal can vary because coal is essentially compressed dirt dug out of the ground with a lot of impurities.

Turning back to why the Conservation Groups are entitled to summary judgment on the heat input violation claim, as noted above, the Court has already ruled that UNC's Permit limits Boiler 6 and 7 to 323.17 mmBtu/hour heat input.  Oct. 21, 2020 Order [Dk.#30] at 3-4.  This ruling is the law of the case.  *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) ("'A most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'")

---

[2] 0.555 * 2 = 1.11.
[3] In air pollution control engineering jargon, "m," is the roman numeral for 1000, and "mm" is 1000 times 1000, or one million.

13

(quoting *Arizona v. California,* 460 U.S. 605, 618 (1983)).  Thus, the Court should not entertain any re-argument by UNC that its Permit does not impose a heat input limit on Boilers 6 and 7.

The Conservation Groups need only prove that the heat input for Boiler 6 or 7 exceeded 323.17 mmBtu/hour to obtain summary judgment on liability.  On December 17, 2014 Boiler #6 was operating at 332 mmBtu/hr for at least one hour, which is above the permitted limit of 323.17 mmBtu/hr.  P. Ex. 5 at 1.[4]  On December 18, 2014, Boiler #7 was operating at 342 mmBtu/hr for at least one hour, which is above the permitted limit of 323.17 mmBtu/hr.  Ex. 5 at 1; P. Ex. 6 at 20:10 – 21:3.[5]

UNC has represented to the Conservation Groups that UNC disposed of all of the other hourly heat input data prior to May 2019.  However, UNC admitted that somewhere under 5 percent of the time they do run with a heat input higher than 323.17 mmBtu/hr.  P. Ex. 6 at 21:13 – 22:5.

Between May 1, 2019 and March 16, 2021, which is the most recent data UNC provided the Conservation Groups, UNC operated Boilers 6 and 7 for at least 269 individual hours above 323.17 mmBtu/hr.  P. Ex. 7 at 4-7; P. Ex. 8 at 1-9; P. Ex. 9 at 4-7; and P. Ex. 10 at 1-11.[6]  For example, on August 27, 2019, UNC operated Boiler 6 at

---

[4] Highlighting on this document was added by Defendant when it provided the document in discovery.
[5] For exhibit citations in this brief, pin cites refer to PDF page numbers of the relevant exhibit, unless citations are for deposition transcript items, in which case pin cites refer to the page and line numbers from the original pages of transcript.
[6] The Conservation Groups have highlighted the values above 323.17 mmBtu/hour in Exs. 2, 3, 4, and 5 for the Court's convenience.  Also, the Conservation Groups are not pursuing any values below 324 mmBtu/hour to avoid having to quibble over rounding conventions.

14

342.4 mmBtu/hr during hour 11:00, which is shown in the 12th column in the row marked 08/27/19 on the fourth page of P. Ex. 7. Because 342.4 mmBtu/hr is greater than the 323.17 mmBtu/hr limit in the Permit, this was a violation of the Permit. Adding the two violations evidenced by P. Ex. 5 and the 269 violations evidenced by P. Exs. 7, 8, 9, and 10, the Conversation Groups are entitled to summary judgment for 271 separate violations in Claim I.

The Conservation Groups are not aware of any defenses UNC is claiming for these 271 violations because UNC has not specifically identified any defenses in discovery. The Conservation Groups speculate that UNC's defense is that UNC believes the hourly heat input values in P. Exs. 7, 8, 9 and 10 are not actual hourly heat input values but rather "estimates" of hourly heat input values. UNC seems to believe these are just estimates because it only measures the heat content of the coal it burns once a day rather than some other frequency.

If this actually is UNC's defense, it would fail for a variety of reasons. For example, during the Fed. R. Civ. P. 30(b)(6) deposition, UNC explained that it uses the "**actual** heat input value." P. Ex. 6 at 25:17 (emphasis added). Moreover, UNC uses the mmBtu/hr heat input values to calculate the hourly air pollution emissions UNC reports to DAQ, which data UNC certifies as "true, accurate, and complete." *Id.* at 119:13 – 120:6, P. Ex. 11 at 4, 13, and 58. If UNC were to succeed on its defense that the hourly heat input data is not accurate, that would mean that UNC falsely certified information to a state government agency and used the United States mail to do so.

15

UNC also provides the hourly heat input data to U.S. EPA.  P. Ex. 12 is data from the EPA's Clean Air Markets Database which EPA obtained from UNC.  One can see this data submitted to EPA is the same hourly heat input data that UNC provided to the Conservation Groups which is the now the basis for their summary judgment motion. For example, in P. Ex. 12, for Boiler 6, ES-001, in hour 1 on 8/27/2019, the heat input is 211.8 mmBtu/hr.  That same 211.8 mmBtu/hr value appears in P. Ex. 7 on the fourth page in hour 1, that is the second column, in the row labeled 08/27/19.

Courts have rejected defenses to citizen suit enforcement actions where the defendant attacks the accuracy of their own data which they have submitted to regulatory agencies.  For example, in *Sierra Club v. Union Oil*, 813 F.2d 1480, 1491-1492, (9th Cir. 1987), vacated on other grounds, 485 U.S. 931 (1988) the 9th Circuit rejected a permittee attacking its own records submitted to the regulatory agency, claiming the records were erroneous.  The 9th Circuit held that allowing a permittee to attack its own reporting would sanction countless additional hours of litigation and create new, complicated factual questions for district courts to resolve.  *Id.*  The 9th Circuit also held that most importantly, allowing permittees to attack their own reports would "create the perverse result of rewarding permittees for sloppy [] practices.  Such an approach would surely undermine the efficacy of the self-monitoring program."  *Id.* at 1492.  While that case was a Clean Water Act citizen suit, the same rationale applies to the Clean Air Act. Courts often use case law from one citizen suit provision to interpret another citizen suit provision unless there are specific differences in the language of the two statutes.  *See*

*e.g.*, *Env't Tex. Citizen Lobby, Inc. v. ExxonMobile Corp.*, 824 F.3d 507, 519-520 (5th Cir. 2016) (applying Clean Water Act case law to Clean Air Act citizen suit). Examples of other cases rejecting defendant in citizen suit enforcement actions attacking their own data submitted to regulatory agencies include *Sierra Club v. Simkins Industries*, 617 F. Supp. 1120, 1128 (D. Md. 1985) ("Good faith and improper recording, therefore, are not good defenses."), aff'd 847 F.2d 1109 (4th Cir. 1988); *Student Pub. Interest Grp. of N.J. v. Tenneco Polymers, Inc.*, 602 F. Supp. 1394, 1400 (D.N.J. 1985); *Nat. Res. Def. Council, Inc. v. Outboard Marine Corp.*, 702 F. Supp. 690, 692-93 (N.D. Ill. 1988); and *United States v. Aluminum Co. of Am.*, 824 F. Supp. 640, 648-49 (E.D. Tex. 1993).

Finally, we note that UNC is the one that chose how frequently it samples its coal's heat content to gather data to calculate heat input into Boilers 6 and 7. It would be inconsistent with the remedial purpose of the Clean Air Act to allow UNC to escape liability because it claims that the sampling frequency it chose is not sufficient.

Furthermore, daily sampling of the heat content of coal is standard practice. For example, under the Acid Rain program in Chapter IV of the Clean Air Act, a program that does not apply to UNC's boilers, power plants have to sample their coal only daily to calculate hourly heat input. *See* 40 C.F.R. Part 75, Appendix F, Section 5.5.3.2 ("Use ASTM D2013-01 for preparation of a **daily coal sample** and **analyze each daily coal sample for gross calorific value** using ASTM D5865-01a or ASTM D5865-10.") (emphasis added). Therefore, the Conservation Groups are entitled to summary judgment as to UNC's liability for 271 violations of the heat input limit.

17

## B. Claim IX: Readiness Testing Running Conflicts

UNC has admitted that it has repeatedly violated permit condition 2.2.A by running an emergency diesel generator (Emission Source ID No. ES-Gen-12) for readiness testing during the concurrent operation of other major pollution sources on campus.  P. Ex. 13 at 1.

Permit condition 2.2.A of UNC's air pollution permit is a pollution control measure that prevents exceedances of the 1-hour nitrogen dioxide National Ambient Air Quality Standard by prohibiting the concurrent operation of various pollution sources by UNC.  Permit condition 2.2.A requires:

> In order to ensure that combustion sources (emergency generators (ID Nos. ES-EG#2l, ES-Gen-12, ESGen-13, ES-Gen-43, ES-Gen-48, ES-Gen-49, and fire water pump ES-FP-3)) do not contribute to an exceedance of the 1-hour N02 National Ambient Air Quality Standard (NAAQS); the Permittee may only operate these generators (ID Nos. ES-EG#21, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48 and ES-Gen-49) for readiness testing when generators (ID Nos. ES-006 and ES-007) are not operating and when readiness testing is not being performed for any other emergency generator, except ES-EG#21, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48, ES-Gen-49, and fire water pump ES-FP-3.

P. Ex. 4 at 44.

On September 20, 2018, UNC violated permit condition 2.2.A by running emergency diesel generator ES-Gen-12 for readiness testing during the concurrent operation of a non-emergency fuel oil generator (Emission Source ID No. ES-006).  P. Ex. 13 at 1.  Readiness testing is when an operator periodically turns a piece of equipment on and runs it in order to ensure that it is operational, and thus will be ready should it be needed in an emergency.  Also on September 20, 2018, UNC violated permit

18

condition 2.2.A by running emergency diesel generator ES-Gen-12 for readiness testing during the concurrent operation of a second non-emergency fuel oil generator (Emission Source ID No. ES-007). P. Ex. 13 at 1. Therefore, Conservation Groups are entitled to summary judgment for two separate violations of permit condition 2.2.A.

## II.     Failure to Monitor Emissions

### A. Claim V: Failure to Perform Daily Visible Emissions Inspections for Coal Ash Handling, Storage, and Loading System

UNC has admitted that it has repeatedly violated permit conditions 2.1.E.2.c and 2.1.E.2.d, and 15A NCAC 02D.0521 by failing to perform and keep records of daily visible emissions inspections for its coal ash handling, storage, and loading system. P. Ex. 14 at 7-8.

Permit condition 2.1.E of UNC's air pollution permit states that the coal ash handling, storage, and loading system consists of one coal ash storage silo with a dry loadout system (Emission Source ID No. ES-030) and one wet loadout system (Emission Source ID No. ES-030A). P. Ex. 4 at 28; P. Ex. 3 at 28. Permit condition 2.1.E.2.c requires that UNC once a day observe the emission points for the coal ash handling, storage, and loading system. *Id.* at 30. Permit condition 2.1.E.2.d requires UNC to maintain records documenting these daily inspections and their results. *Id.* UNC will be deemed in noncompliance with 15A NCAC 02D.0521 if the records required by permit condition 2.1.E.2.d are not kept. *Id.*

19

UNC admitted to 666 violations of the above permit conditions in its Consolidated Response of the University of North Carolina at Chapel Hill to Plaintiffs' First and Second Sets of Requests for Admissions. UNC admitted that daily observations of emission points for the Wet Ash Loadout System were not made on 333 occasions between January 1, 2018 and November 29, 2018. P. Ex. 14 at 8, Response to RFA#22. Likewise, UNC admitted that daily observations of emission points for the Wet Ash Loadout System were not recorded in a logbook on 333 occasions between January 1, 2018 and November 29, 2018. P. Ex. 14 at 7-8, Response to RFA #21. Conservation Groups are therefore entitled to summary judgment for 333 separate violations of permit condition 2.1.E.2.c, and 333 violations of permit condition 2.1.E.2.d and 15A NCAC 02D.0521.

## III. Failure to Inspect Pollution Control Equipment

### A. Claim III: Failure to Annually Inspect Air Cleaners for Emergency Diesel Generators

UNC has admitted that it has repeatedly violated permit conditions 2.1.G.3.k, and 15A NCAC 02D.1111 by failing to inspect the air cleaners for various emergency diesel generators at least once per year.

Permit condition 2.1.G.3.k of UNC's air pollution permit requires UNC to, every 1000 hours of operation or annually, whichever comes first, inspect the air cleaner of each of its eighty-two diesel-fired, compression ignition, emergency generators listed in permit section 2.1.G. P. Ex. 4 at 37; P. Ex. 3 at 36. According to section 2.1.G.3.l of the

Permit, the permittee is deemed to be in noncompliance with 15A NCAC 02D.1111 if the above requirements are not met.  P. Ex. 4 at 37; P. Ex. 3 at 36.

UNC has admitted to five violations of permit condition 2.1.G.3.k in correspondence to DAQ.  In a letter dated November 14, 2019, UNC disclosed to the agency that "[r]ecords are not available documenting the 2017 annual inspection of the air cleaner on emergency generator engine ES-Gen-31." P. Ex. 13 at 1.  *See also* P. Ex. 6 at 42 (same).  UNC also disclosed that "[r]ecords are not available documenting the 2018 annual inspection of the air cleaners on emergency generator engines ES-Gen-25, ES-Gen-26, ES-Gen-27, and ES-Gen-62." P. Ex. 13 at 1. *See also* P. Ex. 6 at 42 (same).

Conservation Groups are therefore entitled to summary judgment for five separate violations of permit condition 2.1.G.3.k and 15A NCAC 02D.1111.

### B.  Claim IV: Failure to Inspect Monthly Particulate Matter Pollution Control Equipment for Coal Handling, Conveying, Crushing, and Storage System

UNC has admitted that it has repeatedly violated permit condition 2.1.D.1.c.i and 15A NCAC 02D.0515 by failing to perform monthly external visual inspections on its coal handling, conveying, crushing, and storage system's ductwork and material collection unit for leaks.

Permit condition 2.1.D of UNC's air pollution permit states that the coal handling, conveying, crushing, and storage system includes coal silo #1 (Emission Source ID No. ES-1) and its bagfilter (Emission Source ID No. CD-011); coal silo #2 (Emission Source ID No. ES-2) and its bagfilter (Emission Source ID No. CD-012); Coal Crusher Building

(Emission Source ID No. ES-010A) and its bagfilter (Emission Source ID No. CD-013).
P. Ex. 2 at 30; P. Ex. 3 at 30.

Permit condition 2.1.D.1.c requires UNC to control particulate matter emissions
from its coal handling, conveying, crushing, and storage system with a bagfilter, which is
a pollution control device functionally similar to a vacuum cleaner.  P. Ex. 2 at 31; P. Ex.
3 at 31.  To assure compliance with this particulate matter pollution control requirement,
permit condition 2.1.D.1.c.i requires a "monthly external visual inspection of the system
ductwork and material collection unit for leaks" from units CD-011, CD-012, and CD-
013.  *Id.*  According to permit condition 2.1.D.1.c, UNC is deemed to be in
noncompliance with 15A NCAC 02D .0515 if the above conditions are not met.  *Id.*

UNC has admitted to failures to inspect units CD-011, CD-012, and CD-013
during the month of October 2016.  P. Ex. 13 at 1.  In correspondence to DAQ
dated November 14, 2019, UNC admitted that none of these permit obligations
were carried out during October 2016.  *Id.*  UNC's corporate representative Lewis
Kellogg also admitted during his 30(b)(6) deposition that UNC did not inspect CD-
011, CD-012, or CD-013 during October 2016.  P. Ex. 6 at 52:4-10.

UNC's inspection logbook for coal silo #2's (ES-2) bagfilter (CD-012)
shows that it did not inspect the bagfilter during March 2016.  P. Ex. 15 at 8.  The
logbook's inspection record for March 2016 is lacking a handwritten date of
inspection, observations, and the signature of the inspector.  *Id.*  Each of the other
months in this record has all three of these items completed.  *Id.* at 1-7.

22

Permit condition 2.1.D.1.c.i is a monthly requirement. As such, each violation of one of these provisions constitutes 28 to 31 violations for each day of that month. *See, e.g.*, *Sierra Club v. Simkins Indust., Inc.*, 847 F.2d 1109, 1112-16 (4th Cir. 1988) (upholding the district court's award of daily civil penalties for a monthly Clean Water Act sampling requirement); *see also Pub. Interest Research Grp. v. Star Enter.*, 771 F. Supp. 655, 668 (D.N.J. 1991) ("This court agrees . . . that a violation of the monthly average limitation constitutes a violation for each day of the month") and cases gathered therein. While these cases deal with violations of Clean Water Act requirements measured via monthly averaging, the once-a-month inspection requirement for UNC exists to ensure that UNC's equipment is working properly to ensure no excessive emissions during the month. Failing to conduct the inspection removes the assurance of a lack of excessive emissions for each day of the entire month, resulting in daily violations.

Thus, Conservation Groups are entitled to summary judgment for 93 separate violations of permit condition 2.1.D.1.c.i and 15A NCAC 02D.0515 for the October 2016 failures to inspect CD-011, CD-012, and CD-013. Also, Conservation Groups are entitled to summary judgment for 31 violations of 2.1.D.1.c.i and 15A NCAC 2D .0515 for the March 2016 failures to inspect CD-012.

Conservation Groups are therefore entitled to summary judgment for 124 separate violations of permit condition 2.1.D.1.c and 15A NCAC 02D .0515.

Case 1:19-cv-01179-CCE-JLW   Document 45   Filed 04/14/21   Page 30 of 44

### C. Claim VI: Failure to Inspect Monthly Pollution Control Equipment for Coal Ash Storage Silo

UNC has admitted that it has repeatedly violated permit conditions 2.1.E.1.c and 2.1.E.1.d, and 15A NCAC 02D .0515 by failing to perform monthly visual particulate matter inspections on its coal ash handling, storage, and loading system, and failing to record inspections in a logbook.

Permit condition 2.1.E.1.c requires UNC to control particulate matter emissions from its coal ash storage silo. P. Ex. 1 at 33; P. Ex. 3 at 33. To assure compliance with this particulate matter pollution control requirement, permit condition 2.1.E.1.c.i requires a "monthly external visual inspection of the system ductwork and material collection unit for leaks" from the coal ash silo bagfilter (Emission Source ID No. CD-031). *Id.* Permit condition 2.1.E.1.d requires UNC to maintain and update "on a monthly basis" a logbook of the inspections and maintenance required by permit condition 2.1.E.1.c.i. *Id.* According to permit conditions 2.1.E.1.c and 2.1.E.1.d, UNC is deemed to be in noncompliance with 15A NCAC 02D.0515 if the above conditions are not met. *Id.*

UNC has admitted to failures to inspect unit CD-031 and failures to update its logbook of such inspections, during the month of October 2016. P. Ex. 13 at 1. In correspondence to DAQ dated November 14, 2019, UNC admitted that these permit obligations were not carried out during October 2016. *Id.* UNC's corporate representative Lewis Kellogg also admitted during his 30(b)(6) deposition that UNC did not inspect CD-031 during October 2016. P. Ex. 6 at 52:4-10. Furthermore, UNC's inspection logbook for CD-031 shows that it failed to inspect or record the

inspection for the bagfilter during October 2016, in violation of 2.1.E.1.c.i. and 2.1.E.1.d.  P. Ex. 16 at 3.

Permit conditions 2.1.E.1.c.i and 2.1.E.1.d are monthly requirements.  As such, as explained above, each violation of one of these provisions constitutes 28 to 31 violations for each day of that month.  *See* Claim IV, *supra.*

Thus, Conservation Groups are entitled to summary judgment for 31 separate violations of permit condition 2.1.E.1.c.i and 15A NCAC 02D .0515 for the October 2016 failures to inspect CD-031.  Likewise, Conservation Groups are entitled to summary judgment for 31 separate violations of permit condition 2.1.E.1.d and 15A NCAC 02D .0515 for the failures to maintain records of the inspection for CD-031 during October 2016.

Conservation Groups are therefore entitled to summary judgment for 62 separate violations of permit conditions 2.1.E.1.c.i and 2.1.E.1.d, and 15A NCAC 02D .0515.

## IV.    Failure to Maintain Pollution Monitoring Equipment

### A. Claim VIII: Failure to Perform Daily Calibration Drift Assessments on Continuous Emission Monitoring System

UNC has admitted that it has repeatedly violated permit conditions 2.1.B.2.e and 2.1.A.2.f; 40 C.F.R. Part 60, Appendix B, Performance Specification 1, 8.1(4)(i) and (ii); 40 CFR Part 60, Appendix F, Quality Assurance Procedure 1; and 15A NCAC 02D.0524 by failing to perform daily calibration drift tests on pollution monitoring equipment for two boilers.

25

Permit condition 2.1.B.2.e requires the following measures for the monitoring of nitrogen dioxide pollution and opacity emissions from Boiler 8 (Emission Source ID No. ES-003):

> A continuous emissions monitor for nitrogen dioxide, and opacity emissions shall be installed, calibrated, maintained, tested, and operated in accordance with 40 CFR Part 60 Appendix B "Performance Specifications" and Appendix F "Quality Assurance Procedures." The Permittee shall be deemed in noncompliance with 15A NCAC 02D .0524 if the monitoring requirements in this Section 2.1.B.2.e. are not complied with.

P. Ex. 4 at 21.

Permit condition 2.1.A.2.f requires similar measures for the monitoring of sulfur dioxide and nitrogen dioxide pollution, and opacity emissions from Boiler 7 (Emission Source ID No. ES-002):

> A continuous emissions monitor for sulfur dioxide, nitrogen dioxide, and opacity emissions shall be installed, calibrated, maintained, tested, and operated in accordance with 40 CFR Part 60, Appendix B "Performance Specifications", and Appendix F "Quality Assurance Procedures." The Permittee shall be deemed in noncompliance with 15A NCAC 02D .0524 if the monitoring requirements in this Section 2.1.A.2.f. are not complied with.

P. Ex. 4 at 13.

UNC is required to perform and record calibration drift tests on its continuous emission monitoring systems for Boiler 7 (ES-002) and Boiler 8 (ES-003) at least once daily. 40 CFR Part 60, Appendix F, Quality Assurance Procedure 1, 4.1. This daily obligation includes the requirement to perform both a Zero Calibration Drift Test and an Upscale Calibration Drift Test. 40 C.F.R. Part 60, Appendix B, Performance Specification 1, 8.1(4)(i) and (ii).

26

UNC admitted to two violations of permit condition 2.1.B.2.e in a deviation report attached to its Title V Semi-Annual Summary Report and sent to DAQ on July 19, 2019. P. Ex. 17 at 45. UNC stated that it did not perform a calibration drift assessment on the continuous emission monitoring system for Boiler 8 (ES-003) on June 22, 2019. *Id.* Further, in its response to Conservation Groups' RFA #27, UNC admitted that no calibration drift assessment was performed for Boiler 8 (ES-003) on that date. P. Ex. 14 at 9. This lapse in compliance constitutes one violation for failure to perform a Zero Calibration Drift Test, and a separate violation for failure to perform an Upscale Calibration Drift Test. 40 C.F.R. Part 60, Appendix B, Performance Specification 1, 8.1(4)(i) and (ii).

UNC also admitted to two violations of permit condition 2.1.A.2.f in its First Quarter 2020 Quarterly Emissions Report, which it sent to DAQ on April 16, 2020. P. Ex. 18 at 2. UNC stated that it did not complete an "opacity daily calibration drift assessment" for Boiler 7 (ES-002) on January 1, 2020. *Id.* This lapse in compliance constitutes one violation for failure to perform a Zero Calibration Drift Test, and a separate violation for failure to perform an Upscale Calibration Drift Test. 40 C.F.R. Part 60, Appendix B, Performance Specification 1, 8.1(4)(i) and (ii).

Conservation Groups are therefore entitled to summary judgment for 4 separate violations of permit conditions 2.1.B.2.e and 2.1.A.2.f; 40 C.F.R. Part 60, Appendix B, Performance Specification 1, 8.1(4)(i) and (ii); 40 CFR Part 60, Appendix F, Quality Assurance Procedure 1; and 15A NCAC 02D.0524.

27

## V.    Failure to Maintain and Submit Compliance Records

### A. Claim II: Failure to Keep Readiness Testing Records

UNC has admitted that it has repeatedly violated permit condition 2.2.A.1 and 15A NCAC 02D.0501(c) by failing to keep hourly operating records for an emergency diesel generator.  Permit condition 2.2.A.1, as with 15A NCAC 02D.0501(c), is designed to prevent the violation of air quality standards by helping to enforce a prohibition on the concurrent operation of certain UNC pollution sources. P. Ex. 1 at 50; P. Ex. 2 at 47-48; P. Ex. 3 at 48; P. Ex. 4 at 44; *see also,* Claim IX, *supra.*  Permit condition 2.2.A.1 requires UNC to maintain operating records for various pollution sources, including the emergency diesel generator at Kenan Stadium (Emission Source ID No. ES-Gen-48), to help ensure that specific pollution sources are not run concurrently.  *Id.*

UNC has admitted to years of continuous violations of permit condition 2.2.A.1 and 15A NCAC 02D.0501(c).  In correspondence to DAQ dated November 14, 2019, UNC admitted that it had not maintained "records of the specific hours of operations" for the emergency diesel generator ES-Gen-48 for an unspecified amount of time.  P. Ex. 13 at 1.  UNC's corporate representative Lewis Kellogg further admitted during his 30(b)(6) deposition that UNC had not maintained hourly operating records for ES-Gen-48 between January 1, 2014 and September or October of 2019.  P. Ex. 6 at 31:18-37:25.

Conservation Groups are therefore entitled to summary judgment for 1,702 chronological days of violations of permit condition 2.2.A.1 and 15A NCAC

02D.0501(c) spanning from December 3, 2014 through July 31, 2019. UNC has admitted that it did not maintain records for ES-Gen-48 prior to its compliance review in September 2019. P. Ex. 6 at 36:16-17. Therefore, it is a supportable conclusion that UNC was still not in compliance as of July 31, 2019.

## VI. Failure to Notify State and Federal Regulators of Title V Permit Violations

### A. Claim VII: Violations of Compliance Reporting Requirements

There is no genuine dispute as to whether UNC has repeatedly violated permit conditions 3.I.A.3.a and 3.P since 2014 by failing to report required permit deviations to DAQ and EPA. UNC has failed to comply with its obligations to report thousands of its violations from Claims I, II, IV, V, and VI, as evidenced by the compliance reports UNC has submitted to DAQ and EPA.

#### 1. Quarterly Reporting Violations

Permit condition 3.I.A.3.a requires UNC to report to DAQ any permit deviations not covered by 15A NCAC 02D.0535 in written, certified, quarterly reports. P. Ex. 1 at 62; P. Ex. 2 at 60-61; P. Ex. 3 at 61; P. Ex. 4 at 60. 15A NCAC 02D.0535 requires UNC to report permit deviations involving excess emissions and malfunctions. Therefore, permit condition 3.I.A.3.a requires UNC to quarterly report to DAQ any nonemissions, nonmalfunction permit deviations.

UNC's corporate representative Lewis Kellogg stated during his 30(b)(6) deposition that quarterly Continuous Emissions Monitoring Compliance Requirement

29

("CEMCR") and Excess Emission Reports ("EER") are the only means by which UNC reports 3.I.A.3.a permit deviations to DAQ. P. Ex. 6 at 97:4 - 98:21. UNC also refers to CEMCRs and EERs as "Quarterly Emissions Reports." P. Ex. 19 at 3. UNC has failed to report its nonemissions, nonmalfunction permit deviations to DAQ via its Quarterly Emissions Reports on thousands of occasions since 2014.

In its Quarterly Emissions Report for the fourth quarter of 2014, UNC failed to report the 29 violations of permit condition 2.2.A.1 spanning from December 3 through December 31, 2014, and described in Claim II, *supra*. P. Ex. 19 at 1-2.

In its Quarterly Emissions Reports for the first, second, third, and fourth quarters of 2015, UNC failed to report the 365 violations of permit condition 2.2.A.1 spanning from January 1 through December 31, 2015, and described in Claim II, *supra*. P. Ex. 20 at 1-3; P. Ex. 21 at 1-3; P. Ex. 22 at 1-2; P. Ex. 23 at 1-3.

In its Quarterly Emissions Report for the first quarter of 2016, UNC failed to report the 91 violations of permit condition 2.2.A.1 spanning from January 1 through March 31, 2016, and described in Claim II, *supra*.; and 31 violations of permit condition 2.1.D.1.c.i for the March 2016 failures to inspect and keep records for CD-012, and described in Claim IV, *supra*. P. Ex. 11 at 1-2. In its Quarterly Emissions Reports for the second and third quarters of 2016, UNC failed to report the 183 violations of permit condition 2.2.A.1 spanning from April 1, 2016 through September 30, 2016, and described in Claim II, *supra*. P. Ex. 24 at 1-2; P. Ex. 25 at 1-2. In its Quarterly Emissions Report for the fourth quarter of 2016, UNC failed to report the 92 violations of

30

permit condition 2.2.A.1 spanning from October 1, 2016 through December 31, 2016, and described in Claim II, *supra*.; 93 violations of 2.1.D.1.c.i for the October 2016 failures to inspect CD-011, CD-012, and CD-013 and described in Claim IV, *supra*.; and 62 violations of permit conditions 2.1.E.1.c.i and 2.1.E.1.d for the October 2016 failures to inspect CD-031, and described in Claim VI, *supra*.  P. Ex. 26 at 1-2.

In its Quarterly Emissions Reports for the first, second, third, and fourth quarters of 2017, UNC failed to report the 365 violations of permit condition 2.2.A.1 spanning from January 1 through December 31, 2017, and described in Claim II, *supra*.  P. Ex. 27 at 1-2; P. Ex. 28 at 1-3; P. Ex. 29 at 1-2; P. Ex. 30 at 1-3.

In its Quarterly Emissions Reports for the first, second, and third quarters of 2018, UNC failed to report the 273 violations of permit condition 2.2.A.1 spanning from January 1 through September 30, 2018, and described in Claim II, *supra*.; and 546 violations of permit conditions 2.1.E.2.c and 2.1.E.2.d spanning from January 1 through September 30, 2018, and described in Claim V, *supra*.  P. Ex. 31 at 1-3; P. Ex. 32 at 1-3; P. Ex. 33 at 1-2.

In its Quarterly Emissions Reports for the first, second, and third quarters of 2019, UNC failed to report the 212 violations of permit condition 2.2.A.1 spanning from January 1 through July 31, 2019, and described in Claim II, *supra*.  P. Ex. 34 at 1-2; P. Ex. 35 at 1-3; P. Ex. 36 at 1-3.

Case 1:19-cv-01179-CCE-JLW   Document 45   Filed 04/14/21   Page 38 of 44

Conservation Groups are therefore entitled to summary judgment for these 2,342 violations of permit condition 3.I.A.3.a. and spanning from December 3, 2014 to July 31, 2019.

## 2. Annual Certification Violations

Permit condition 3.P mandates that UNC "shall submit to the DAQ and the EPA" annual compliance certifications reporting UNC's compliance status "with all federally-enforceable terms and conditions in the permit, including emissions limitations, standards, or work practices" for the year in question. P. Ex. 1 at 63; P. Ex. 2 at 60; P. Ex. 3 at 59; P. Ex. 4 at 61. The Title V permit regulations define all Title V permit deviations as federally enforceable:

> [a]ll terms and conditions in a [Title V] permit, including any provisions designed to limit a source's potential to emit, are enforceable by the Administrator and citizens under the Act.

40 C.F.R. § 70.6(b)(1). UNC has failed to report its permit deviations to DAQ and EPA via its annual Title V Compliance Certifications on thousands of occasions since December 3, 2014.

In its 2014 Title V Compliance Certification to EPA, UNC failed to report the two violations of heat input permit condition 2.1.A from December 17 and 18, 2014 described in Claim I, *supra.;* and the 29 violations of readiness testing permit condition 2.2.A.1 spanning from December 3 through December 31, 2014, and described in Claim II, *supra.* P. Ex. 37 at 1-38. In its 2014 Title V Compliance Certification to DAQ, UNC also failed to report the same 2 violations of permit condition 2.1.A and the same 29

32

violations of permit condition 2.2.A.1.  P. Ex. 38 at 1-2 and P. Ex. 39.  The failures to report to EPA and DAQ constitute separate violations, resulting in a total of 62 separate violations of permit condition 3.P in 2014.  P. Ex. 1 at 63.

In its 2015 Title V Compliance Certification to EPA, UNC failed to report the 365 violations of readiness testing permit condition 2.2.A.1 spanning January 1 through December 31, 2015 and described in Claim II, *supra*. P. Ex. 40 at 1-2.  As a result, UNC is liable for 365 reporting violations of permit condition 3.P in 2015.  P. Ex. 1 at 63; P. Ex. 2 at 60.

In its 2016 Title V Compliance Certification to DAQ, UNC failed to report the 366 violations of readiness testing permit condition 2.2.A.1 spanning from January 1 through December 31, 2016, and described in Claim II, *supra*.; the 124 violations of particulate matter emissions control permit condition 2.1.D.1.c.i during March and October 2016 and described in Claim IV, *supra.*; and the 62 violations of particulate matter pollution control permit conditions 2.1.E.1.c and 2.1.E.1.d in October 2016 and described in Claim VI, *supra.*  P. Ex. 41 at 1-2.  As a result, UNC is liable for a total of a total of 552 reporting violations of permit condition 3.P in 2016.  P. Ex. 2 at 60; P. Ex. 3 at 59.

UNC has also admitted that it did not notify EPA or DAQ of its 666 violations of visible emissions inspection permit conditions 2.1.E.2.c and 2.1.E.2.d spanning January 1 through November 29, 2018 and described in Claim V, *supra.* P. Ex. 14 at 8, Response to RFA #23.  The failures to report to both EPA and DAQ constitute separate violations,

33

resulting in a total of 1,332 violations of permit condition 3.P in 2018.  P. Ex. 3 at 59; P. Ex. 4 at 61.

In its 2019 Title V Compliance Certification to DAQ, UNC failed to report the 129 violations of the heat input permit condition 2.1.A spanning August 27 through December 19, 2019 and described in Claim I, *supra.;* and the 212 violations of readiness testing permit condition 2.2.A.1 spanning January 1 through July 31, 2019 and described in Claim II, *supra.*  P. Ex. 42 at 1-48.  As a result, UNC is liable for a total of 341 reporting violations of permit condition 3.P in 2019.  P. Ex. 4 at 61.

Conservation Groups are therefore entitled to summary judgment for 2,652 violations of permit condition 3.P spanning from December 3, 2014 to December 19, 2019.  In total, UNC is liable for 4,994 violations of permit conditions 3.I.A.3.a and 3.P.

## CONCLUSION

There is no genuine dispute as to any material fact regarding the liability of UNC for the 7,830 strict liability permit violations detailed in Claims I through IX, and Conservation Groups are entitled to judgment as a matter of law.  The Court should enter summary judgment and find UNC liable for the permit violations detailed in Claims I through IX.

Dated: April 14, 2021                    Respectfully submitted,

                                          /s/ Perrin W. de Jong
                                         Perrin de Jong
                                         N.C. State Bar No. 42773
                                         Attorney for the Plaintiffs
                                         Center for Biological Diversity
                                         P.O. Box 6414
                                         Asheville, NC 28816
                                         Telephone: (828) 252-4646
                                         Facsimile: (828)537-4289
                                         Email: perrin@biologicaldiversity.org

                                         Robert Ukeiley[7]
                                         Colorado Bar No. 26747
                                         Attorney for the Plaintiffs
                                         Center for Biological Diversity
                                         1536 Wynkoop St., Ste. 421
                                         Denver, CO 80202
                                         Telephone: (720) 496-8568
                                         Email: rukeiley@biologicaldiversity.org

                                         *Counsel for the Plaintiffs Center for Biological
                                         Diversity and Sierra Club*

---

[7] Pursuant to LR83.1(d) Robert Ukeiley, a member in good standing of the bar of the Colorado Supreme Court, appears by special appearance in association with Perrin de Jong, a member of the bar of this Court.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d), the undersigned counsel certifies that this Corrected Response contains 8,860 words, excluding the parts that do not count towards the limitation as provided in Local Rule 7.3(d)(1).  In making this certification, I have relied on the word count of the word-processing system used to prepare the brief.

This the 14th day of April 2021.

   /s/ Perrin W. de Jong
Perrin W. de Jong
N.C. State Bar No. 42773
P.O. Box 6414
Asheville, NC 28816
Telephone: (828) 252-4646
Email: perrin@biologicaldiversity.org

*Counsel for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on counsel for the Defendant via the Court's ECF system.

This the 14th day of April, 2021.

                                     /s/ Perrin W. de Jong
                                     Perrin W. de Jong
                                     N.C. State Bar No. 42773
                                     P.O. Box 6414
                                     Asheville, NC 28816
                                     Telephone: (828) 252-4646
                                     Email: perrin@biologicaldiversity.org

                                     *Counsel for the Plaintiffs*