# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL<br>DIVERSITY and SIERRA CLUB, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | 1:19-CV-1179 |
| | ) | |
| UNIVERSITY OF NORTH<br>CAROLINA AT CHAPEL HILL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The defendant University of North Carolina operates multiple sources of air pollution that are regulated by the Clean Air Act. Pursuant to permits issued by the North Carolina Division of Air Quality, UNC is authorized to emit limited amounts of certain air pollutants. The plaintiffs, Center for Biological Diversity and Sierra Club, contend that UNC has violated various permit conditions related to the recordkeeping, reporting, monitoring, inspection, and operation of some of its major air pollution sources.

UNC is entitled to summary judgment on all nine claims. The plaintiffs lack standing to bring Claims Two through Eight, and the uncontroverted extrinsic evidence as to Claim One shows that the ambiguous heat input capacity term of Section 2.1.A in the permit is not an enforceable limit. As for Claim Nine, the undisputed evidence shows that UNC's violation of Section 2.2 was not repeated. UNC's motion for summary judgment will be granted and the plaintiffs' cross-motion will be denied.

## I. The Pollution Sources and UNC's Permit

UNC operates multiple major stationary sources of air pollution that are regulated by Title V of the Clean Air Act on its Chapel Hill campus. Doc. 58 at § I ¶ 1; Doc. 42-10 at 7–13. UNC must operate these stationary pollution sources in compliance with an air pollution permit issued by North Carolina's Division of Air Quality. 42 U.S.C. §§ 7661a(a), 7661c(a); 40 C.F.R. § 70.6(a)(1). UNC has operated its major stationary air pollution sources under four different permits over the relevant time period, identical in relevant part. *See* Docs. 42-7, 42-8, 42-9, 42-10. For ease of reference, the Court will cite Permit No. 03069T35 as the operative permit. Doc. 42-10.[1]

The permit authorizes UNC to use coal, natural gas, No. 2 fuel oil, wood, and torrified wood to fire two circulating fluidized combustion boilers, identified in the permit as Boilers 6 and 7.[2] *See* Doc. 42-10 at 7, 14–24. The permit also authorizes UNC to operate an emergency diesel-fired generator, identified as ES-Gen-12. Doc. 42-10 at 10, 48. These air pollution sources emit a variety of air pollutants, including particulate matter (PM), sulfur dioxide ($SO_2$), Carbon Monoxide (CO), Hydrochloric acid (HCl), Mercury (Hg), and nitrogen oxides (NOx). Doc. 42-10 at 14–15; Doc. 42-11 at 2; Doc. 43-5 at 1.

---

[1] During the course of this litigation, DAQ issued Permit No. 03069T36 to replace Permit No. 0306T35, which became effective August 5, 2021, after briefing was completed. Doc. 59-1 at 12; Doc. 58 at § I ¶ 6;

[2] Boilers 6 and 7 are also identified more specifically in the permit as ES-001 and ES-002, respectively.

2

## II.     Citizen Suits under the Clean Air Act

In 1990, Congress amended the Clean Air Act to authorize citizen suits against any person "alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation under this chapter . . . ." 42 U.S.C. § 7604(a)(1). An "emission standard or limitation under this chapter" includes "any. . . standard, limitation, or schedule established under any permit issued . . . under any applicable State implementation plan approved by the [EPA] Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations." *Id*. § 7604(f)(4); *Nat'l Parks Conservation Ass'n. v. Tenn. Valley Auth.*, 480 F.3d 410, 418 (6th Cir. 2007).

An action alleging wholly past violations can be maintained if the plaintiff asserts at least two violations of the same standard, even if the violations are not ongoing. *See Env't Tex. Citizen Lobby v. ExxonMobil Corp.*, 968 F.3d 357, 365 (5th Cir. 2020) .

## III.    Standing

UNC contends that the plaintiffs lack standing to bring their claims because they have not shown concrete injuries traceable to the alleged violations. *See* Doc. 40 at 17–27; Doc. 46 at 7–14; Doc. 50 at 6–13. The Court also has an "independent duty to assure that standing exists." *Ctr. for Biological Diversity v. EPA*, 90 F. Supp. 3d 1177, 1186 (W.D. Wa. 2015) (relying on *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). Plaintiffs must demonstrate standing for each claim, for each form of relief sought, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), and at each stage of the litigation. *See Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992).

3

Organizational plaintiffs, like the Center and the Sierra Club, can show standing to sue in two ways: (1) on their own behalf (organizational standing) or (2) on behalf of their members (representational or associational standing). *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 388 (M.D.N.C. 2019) (citing *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005)). Here, the plaintiffs rely on representational standing to sue on behalf of individual members Sonia Desai and Bridget Farrell.[3]

An organization has representational standing if "at least one of its 'identified' members 'would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 683 (4th Cir. 2020) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)); *Guilford Coll.*, 389 F. Supp. 3d at 388.

UNC does not challenge the existence of the latter two factors, and the Court finds that the interests at stake are germane to the purposes of these two organizations and that neither the claims asserted, nor the relief requested, require the participation of individual members beyond their role as witnesses. Both organizations are conservation groups committed to

---

[3] In the briefing, the Center and the Sierra Club relied only on representational standing. *See* Doc. 42 at 10–14; Doc. 48 at 8–14; Doc. 51 at 6–12. At oral argument, the plaintiffs asserted for the first time that they had standing because of their own injuries. Minute Entry 6/30/2021. The Court does not ordinarily consider arguments raised for the first time at oral argument. *See Deseret Trust Co. v. Unique Investment Corp.*, No. 2:17-cv-00569, 2018 WL 8110959, at *4 (D. Utah July 3, 2018) (collecting cases); *see also* LR 7.3(h) (prohibiting parties from raising new arguments in a reply brief).

4

preservation and protection of the environment and its ecosystems and resources. Doc. 42-5 at ¶ 2 (Center for Biological Diversity); Doc. 42-4 at ¶¶ 2–3 (Center for Biological Diversity and the Sierra Club). UNC challenges the first requirement, contending that the individual members do not have standing to sue in their own right. An individual has standing "in their own right" if they can show an "injury-in-fact" that is "fairly traceable" to the defendant's conduct and is "likely to be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (cleaned up).

The plaintiffs' claims can be usefully divided into "recordkeeping" and "operating" claims. The Court will consider standing for each group separately. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[S]tanding is not dispensed in gross; rather plaintiffs must demonstrate standing for each claim that they press . . . .").

### A. Claims Related to Recordkeeping, Reporting, Inspecting, and Monitoring

Claims Two through Eight assert various failures to maintain records,[4] inspect equipment,[5] report permit deviations to government authorities,[6] and monitor pollution controls,[7] as required by UNC's permit. To demonstrate that Ms. Desai and Ms. Farrell

---

[4] Claims Two, Five, and Six. Doc. 33 at ¶¶ 40–42, 47–50.

[5] Claims Three and Four. *Id.* at ¶¶ 43–46.

[6] Claim Seven. *Id.* at ¶¶ 51–54.

[7] Claim Eight. *Id.* at ¶¶ 55–57.

5

suffered an "injury-in-fact," the plaintiffs must show a concrete injury; it may be tangible[8] or intangible,[9] but in every case, it "must be *de facto*; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (cleaned up).

"Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 1549. "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion*, 141 S. Ct. at 2205. While Congress's views are "instructive" in deciding whether a harm is sufficiently concrete to qualify as an injury-in-fact, a plaintiff does not automatically satisfy the injury-in-fact requirement when a statute creates a private cause of action. *See Spokeo*, 136 S. Ct. at 1549.

The plaintiffs asserted at oral argument that UNC's various failures to record, inspect, report, and monitor its emission sources concretely injured Ms. Desai and Ms. Farrell by exposing them to illegal and harmful pollutants. Minute Entry 6/30/2021. The plaintiffs offer no evidence to support this contention. Rather, they ask the Court to infer harm from excessive emissions based on the fact that these tasks were never completed, just as the permit itself authorizes the North Carolina DAQ to presume that, had they been completed, the

---

[8] *See, e.g.*, *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000) (loss of money); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012 & n.3 (1992) (loss of real property).

[9] *See, e.g.*, *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) (informational harm); *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) (aesthetic harm).

results would have shown emissions in excess of those authorized by the permit.[10] The plaintiffs do not offer any case law to support this stacked-inference approach, which amounts to nothing more than "a bare procedural violation, divorced from any concrete harm." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 258 (4th Cir. 2020) (citing *Spokeo*, 136 S. Ct. at 1549).

In the alternative, the plaintiffs contend that Ms. Desai and Ms. Farrell were injured because UNC's failure to comply with the monitoring and reporting requirements prevents them from knowing whether UNC is complying with emissions requirements and that this causes harm. *See* Doc. 42-4 at ¶¶ 10–11 (testifying that failure to comply with permit requirements makes "it difficult if not impossible to know whether permit requirements are being met."); Doc. 42-5 at ¶ 9 (describing a "professional interest in seeing the successful implementation of beneficial air quality initiatives."). But they fail to address the standards set by the Supreme Court for informational injuries. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (recognizing an informational injury for standing). They do not identify a statutory source that provides a right to this information, nor do they explain how denial of that information creates a real harm with an adverse effect that Congress sought to prevent by requiring disclosure. *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345–46 (4th Cir.

---

[10] *See, e.g.*, Doc. 42-10 at p. 34, ¶ 2.d.iii ("The Permittee shall be deemed in noncompliance of 15A NCAC 02D .0521 if these records are not maintained.").

2017). The evidence in the case on which they rely[11] was much more specific than the generalized concerns here.

The plaintiffs have not made a sufficient showing that Ms. Desai or Ms. Farrell have suffered a concrete injury as a result of any recordkeeping, reporting, monitoring, or inspecting violations. In the absence of this showing, UNC is entitled to summary judgment as to the plaintiffs' claims raising these violations, designated in the second amended complaint as Claims Two through Eight.

### B. Claims Related to Unauthorized Operation of Pollution Sources

Claims One and Nine assert that UNC operated certain stationary pollution sources, such as its boilers and generators, in ways that were not authorized by the permit, which resulted in the unauthorized emission of harmful air pollutants in areas frequently visited by the plaintiffs' members. As to Claim One, the plaintiffs contend that UNC's Boilers 6 and 7 burned fuel sources in excess of their permitted hourly heat input capacity during 269 individual hours between May 1, 2019, and May 16, 2021. Doc. 42 at 21. As to Claim Nine, the plaintiffs contend that UNC violated a specific permit condition when it operated one of its diesel-fired emergency generators concurrently with two other major pollution sources on September 20, 2018. *Id.* at 25. The plaintiffs contend that Ms. Desai and Ms. Farrell have suffered injuries-in-fact from "reasonable concerns" that their health, recreational, and

---

[11] *Sierra Club v. Simkins Indus.*, 847 F.2d 1109, 1112–13 (4th Cir. 1988), *abrogation recognized on other grounds by Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 149 F.3d 303, 306 (4th Cir. 1998), *itself rev'd sub nom.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000).

8

aesthetic interests have been compromised by UNC's unauthorized operation of these emission sources. *Id*. at 11–12.

### 1. Injury-in-Fact

As is relevant here, the purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). Consistent with that purpose, the Act makes the Environmental Protection Agency responsible for developing acceptable levels of airborne emissions, known as National Ambient Air Quality Standards (NAAQS), "the attainment and maintenance of which . . . are requisite to protect the public health." *Id*. § 7409(b)(1).

"To date, EPA has issued NAAQS for six pollutants: sulfur dioxide, particulate matter, nitrogen dioxide, carbon monoxide, ozone, and lead." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 308 (2014); *see generally* 40 C.F.R. § 50 (2021) *et seq*.; *NAAQS Table*, ENV. PROT. AGENCY, https://www.epa.gov/criteria-air-pollutants/naaqs-table (last visited Aug. 26, 2021). NAAQS are subdivided into Primary NAAQS, 42 U.S.C. § 7409(b)(1), and Secondary NAAQS, *id*. § 7409(b)(2). Primary NAAQS define a level of air quality intended, "with an adequate margin of safety, to protect the public health," while Secondary NAAQS reflect the level "necessary to protect the public welfare from any known or anticipated adverse effects of a pollutant." *See* 40 C.F.R. § 50.2(b).

Depending in part on the fuel source used, the boilers and generators at issue in Claims One and Nine emit sulfur dioxide, particulate matter, nitrogen dioxide, or carbon monoxide, the amounts of which are regulated by the permit. Doc. 58 at § 1 ¶ 4; *see also* Doc. 42-10 at

9

14–15, 52 (showing emissions standards applicable to ES-001, ES-002, and ES-Gen-12). Pollutants such as particulate matter, nitrogen oxides, and sulfur dioxide can cause respiratory illnesses in humans, including asthma. Doc. 58 at § I ¶ 5; Doc. 51 at 10 n.3. It is thus undisputed that when in operation, UNC's boilers and generators emit pollutants that, in concentration, are potentially harmful to public health and welfare.

Ms. Desai and Ms. Farrell have health, aesthetic, and recreational interests in air quality in Chapel Hill and the areas around UNC's campus. Both individuals frequently visit and participate in recreational activities on West Franklin Street in Chapel Hill, and they plan to continue to do so. Doc. 42-4 at ¶¶ 1, 6, 9; Doc. 42-5 at ¶¶ 1, 3–6. Ms. Desai suffers from asthma, for which she "carr[ies] medication . . . at all times in order to manage asthma attacks that are triggered by environmental exposures" and for which she has been hospitalized and occasionally needs the emergency room. Doc. 42-5 at ¶ 7. Cleaner air in the Chapel Hill and the neighboring Carrboro areas would "trigger fewer –and less severe – asthma attacks" for Ms. Desai, *id*. at ¶¶ 8–12, and would enable both Ms. Desai and Ms. Farrell to reap greater enjoyment from exercising and recreating in the area. *Id*. at ¶¶ 7, 9; Doc. 42-4 at ¶¶ 10–14.

UNC's Boilers 6 and 7, at issue in Claim One, are housed in its Cogeneration Facility, which is less than one block from Franklin Street. *See* Doc. 42-5 at ¶ 10 (describing the sight of "smoke billowing" out of UNC's smokestack); Doc. 47 at 5 (showing satellite image of distance); Doc. 58 at § 2 ¶ 3 (stipulating that the boilers are near areas that Ms. Desai and Ms. Farrell regularly use). The emergency generator at issue in Claim Nine is housed in the Craige Parking Deck, which is also located on UNC's Chapel Hill campus. Doc. 42-10 at 10. Claim Nine also deals with the concurrent operation of emission sources located at the

10

Cogeneration Facility. *See id.* at 42 (showing location of non-emergency generators ES-006 and ES-007).

The plaintiffs have not introduced any evidence that emissions from the Cogeneration Facility or the Craige Parking Deck reach Franklin Street, but it is a reasonable and uncontroverted inference that one block is within the discharge range of a stationary emission source regulated by the Clean Air Act. UNC has not identified any case to the contrary. The Facility, the Parking Deck, and Franklin Street are so close together[12] as to give rise to "reasonable concerns" by Ms. Desai and Ms. Farrell that their health, recreational, and aesthetic interests have been compromised by unauthorized emissions. *Laidlaw*, 528 U.S. at 183–84 ("[T]he affidavits and testimony presented by [the plaintiffs] in this case assert that [the defendant's] discharges, and the affiant members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests."). The Court is satisfied that the plaintiffs have demonstrated a concrete injury-in-fact as to Claims One and Nine.

UNC asserts that the plaintiffs cannot show injury in fact because there is no evidence that it has "violated any emissions limit," Doc. 50 at 11, and that the air quality in the Chapel Hill area remains acceptable under EPA standards. Doc. 46 at 14. But UNC conflates injury-in-fact for one type of claim—unauthorized operation of an emission source—with claims of another type—exceeding an emissions limit. For standing purposes, the plaintiffs do not need to show that UNC exceeded its allowable emissions in order to show that they were harmed by

---

[12] *See* Doc. 47 at 7 (showing wide image of Chapel Hill with Franklin Street and UNC's campus labeled); Doc. 42-5 at ¶ 10 (describing the sight of "smoke billowing" out of UNC's smokestack).

11

the emissions coming from the allegedly unauthorized operation of an emission source.  Nor do the plaintiffs need to wait until the air quality is unbreathable in Chapel Hill before they "can invoke the protections" of the Clean Air Act.  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000).

### 2. Traceability

The plaintiffs must next show that the injuries-in-fact suffered by their members are traceable to UNC's alleged conduct.  While traceability is analyzed separately from injury-in-fact, proof for each element "often overlaps."  *Id*. at 154.

The Fourth Circuit has not adopted a specific standard for evaluating traceability of injury-causing air pollution.  For citizen suits under the Clean Water Act, the Fourth Circuit has said that traceability means something less stringent than tort causation and that scientific certainty is unnecessary.  *Id*. at 161.  "Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern."  *Id*. (discussing traceability in the CWA context) (cleaned up).  Several other circuits and district courts have applied similar standards in environmental suits involving the Clean Air Act and the Clean Water Act.  *See Utah Phys. For a Healthy Env't v. Diesel Power Gear LLC*, 374 F. Supp. 3d 1124, 1133 n.36 (D. Utah 2019) (collecting cases).

It is undisputed that the boilers at issue in Claim One are housed at UNC's Cogeneration Facility, which is only a block away from Franklin Street where Ms. Desai and Ms. Farrell frequently work, visit, and socialize.  *See* Doc. 47 at 5.  As stated in connection with the injury-in-fact inquiry, no court has ever held that one block is too far away to infer

12

that the area is within the discharge range of a stationary emission source. The emergency generator that is the subject of Claim Nine is also on campus, *see* Doc. 42-10 at 10 (ES-Gen-12), and Claim Nine centers on concurrent operation of that generator with two other emission sources located at the Cogeneration Facility. *See id.* at 42 (listing location of non-emergency generators ES-006 and ES-007). The plaintiffs have shown that UNC discharges air pollutants that "directly and immediately contribute to air pollution" in an area where their members maintain health, aesthetic, and recreational interests and that the air pollution harms those interests. *Utah Phys. For a Healthy Env't*, 374 F. Supp. 3d at 1135. This is sufficient to demonstrate traceability. *Gaston Copper*, 204 F.3d at 161.

UNC advocates for a more stringent traceability test, relying on cases from the Fifth Circuit. *See Env't Texas*, 968 F.3d at 370; *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 362 (5th Cir. 1996). But those cases do not say that scientific evidence is required when the area regularly visited by the plaintiffs' members is within walking distance of the emission sources. There may be some point at which scientific evidence is required, but just as it is appropriate to take judicial notice in Clean Water Act cases that water flows downstream, the Court can take judicial notice that the wind can, and does, blow polluted air within and around at least several blocks.

UNC also briefly contends that the plaintiffs cannot demonstrate traceability because of "other sources" of emissions in the area. Doc. 46 at 13. Specifically, UNC points to two large highways and an industrial cement plant that border Chapel Hill. *See* Doc. 47 at 9 (showing satellite image of Chapel Hill). In *Gaston Copper*, the Fourth Circuit indicated that a defendant may fairly contest traceability of pollutants in a waterway by pointing to

"alternative culprit[s]." 204 F.3d at 162. Other courts applying the Fourth Circuit's traceability standard, however, have rejected this view, highlighting "the contributory nature of pollution in a specific location" and noting that if a plaintiff were required to show with "scientific certainty that the defendant's emissions, and only the defendant's emissions, are the source of the harm," then a defendant could defeat standing "merely by pointing to other sources of pollution." *Utah Phys. for a Healthy Env't*, 374 F. Supp. 3d at 1133–34 (cleaned up).

There is no dispute that UNC's boilers and generators emit the kinds of pollutants that, in concentration, can harm public health and welfare. *See,* Doc. 58 at § 1 ¶ 4; *see also* Doc. 42-10 at 14–15, 52 (showing emissions standards applicable to ES-001, ES-002, and ES-Gen-12). The plaintiffs do not need to show with scientific certainty that UNC's pollutants are the sole or even primary source of harm to their members to establish traceability, and the presence of "alternative culprits" here does not take away from the fact that UNC contributes to air pollution in Chapel Hill.

### 3. Redressability

For the final standing requirement, redressability, the plaintiffs must show that "it is likely, as opposed to merely speculative" that the injuries suffered by their members "will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 181. The plaintiffs do not need to show that a favorable decision will completely relieve an injury or relieve every injury, *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982), but the relief sought must specifically redress the injuries to the plaintiffs' members, "as opposed to merely advancing generalized environmental interests." *WildEarth Guardians v. Public Service Co. of Colorado*, 690 F.3d

14

1174, 1190 (10th Cir. 2012). Because the plaintiffs must have standing to pursue each form of relief they seek, they must show that their members' injuries can be redressed by civil penalties, injunctive relief, declarative relief, and remediation of damaged environment. *See* Doc. 33 at ¶¶ 63–70.

Civil penalties, if awarded, would redress injuries to the plaintiffs' members by deterring future violations. *See Laidlaw*, 528 U.S. at 185–86. Declaratory and injunctive relief could also provide redress by curbing ongoing violations and halting UNC's continued contribution to pollution-related injuries suffered by the plaintiffs' members. Similarly, any remediation ordered by the Court as to damage caused by UNC's alleged violations would improve the quality of air breathed by the plaintiffs' members and may also further deter UNC from future violations. This is enough to satisfy the redressability requirement. *See Utah Phys. for a Healthy Env't*, 374 F. Supp. 3d at 1136.

UNC contests redressability only as to Claim One. Specifically, UNC points out that the permit containing the condition relevant to Claim One expired in March 2021 and that the corresponding condition in UNC's replacement permit, which was recently issued on August 5, 2021, removes the reference to the heat input capacity of Boilers 6 and 7. *See* n. 1 *supra;* Doc. 59-1 at 20 (showing corresponding condition in replacement permit without reference to heat input capacity). For this reason, UNC contends that the Court cannot enforce compliance with a permit that no longer applies, nor can it impose penalties on UNC as a measure of deterrence. Doc. 46 at 18–19. But UNC cites no case to support its argument that penalties would be inappropriate, and the Court sees no reason why issuance of a new permit precludes imposition of civil penalties for past violation of a previous permit. *See, e.g., Sierra Club v.*

15

*BP Prods. N. Am., Inc.*, No. 2:19-CV-337-PPS-JEM, 2021 WL 1399805, at *10–11 (N.D. Ind. Apr. 14, 2021).

The plaintiffs have shown that their members suffer redressable injuries-in-fact that are fairly traceable to UNC's violations of Claims One and Nine. The Center and the Sierra Club have standing to pursue these claims.

## IV.    Merits

Both parties moved for summary judgment asserting that the material facts are undisputed. The permit itself is in evidence and undisputed. Doc. 42-10. The parties have filed a joint submission of stipulated facts relevant to Claims One and Nine, with citations to the supporting evidence. *See* Doc. 58.

### A. Claim One

#### 1. Undisputed Facts

The permit provides specific terms, conditions, and limitations for various emission sources. Two such covered emission sources, Boilers 6 and 7, are identified in Section 1 of the permit, each as "one coal/natural gas/No. 2 fuel oil/wood (non-CISWI)/torrified wood (non-CISWI)-fired, circulating fluidized combustion boiler, 323.17 million Btu per hour heat input capacity." Doc. 42-10 at 7. Section 2 details the "specific terms, conditions, and limitations" applicable to UNC's emission sources, and Section 2.1.A deals specifically with Boilers 6 and 7. *See id.* at 14. Section 2.1.A repeats the 323.17 million heat input capacity number in the heading before setting forth a chart with the specific limits and standards for

16

particulate matter, sulfur dioxide, nitrogen dioxide, hazardous air pollutants, and nitrogen oxide. *Id*. at 14–15.

On December 17 and 18, 2014, UNC performed various compliance tests on Boilers 6 and 7, which, for at least one test, lasted a minimum of one hour. *See* Doc. 58 at § III ¶¶ 4–6; Doc. 42-11 at 2 (showing compliance test data for both boilers pursuant to EPA Method 30B for Mercury); Doc. 51-4 at 2 (showing EPA Method 30B provides that a "minimum sample run time . . . for emissions testing to characterize an emission source is 1 hour."). On December 17, 2014, Boiler 6's recorded heat input was, at one point, approximately 332 mmBtu/hr. Doc. 58 at § III ¶ 7. On December 18, 2014, Boiler 7's recorded heat input was, at one point, approximately 342 mmBtu/hr. *Id*. at § III ¶ 8. Thus, on two different occasions in December 2014, each boiler operated at a capacity higher than the 323.17 mmBtu/hr heat input capacity stated in the permit. Regulators at the North Carolina Division of Air Quality were aware of these heat input numbers from the boiler tests and found them to be "acceptable." *Id*. at § III ¶ 9; Doc. 42-11 at 1.

As required by the Clean Air Act, the plaintiffs gave DAQ notice of their intent to bring this claim. *See* Doc. 40-6 at 7. DAQ analyzed the claim and expressly determined that there was no reason for an enforcement action because the heat input capacity listed in the heading of Section 2.1.A is a "descriptor," not an "enforceable limit." Doc. 58 at § III ¶ 15; Doc. 40-6 at 8. As stated in the DAQ comments:

> The 323.17 million Btu per hour (mmBtu/hr) heat input boiler descriptor in UNC's permit is not considered to be an enforceable limit by DAQ. It is a nominal heat input capacity that the boiler manufacturer uses to describe a design parameter for the boiler.

17

Doc. 40-6 at 8.

Boilers 6 and 7 continue to run with a heat input higher than 323.17 mmBtu/hr, on occasion, somewhere under 5% of the time. Doc. 42-12 at 11–12. Between May 1, 2019, and March 16, 2021, UNC operated Boilers 6 and 7 for at least 269 individual measured hours above 323.17 mmBtu/hr. Doc. 58 at § III ¶ 11; Doc. 43 at 4–7; Doc. 43-1 at 1–9; Doc. 43-2 at 4–7; Doc. 43-3 at 1–11.

UNC's permit expired on March 31, 2021. Doc. 58 at § III ¶ 16. After a public hearing in connection with renewal of the permit, *see* Doc. 59-1 at 81 (showing hearing report), DAQ issued a replacement permit that became effective on August 5, 2021. *Id*. at 12. The replacement permit removed from the Section 2.1 heading any reference to the heat input capacity of Boilers 6 and 7. *Id*. at 20. DAQ did not identify removal of heat input capacity references to be a significant change in the "Table of Changes" attached to the draft permit. *Id*. at 6–11.

### 2. Analysis

The Section 2.1.A permit language is ambiguous. If the "323.17 mmBtu/hr" figure is a limit or standard, the plaintiffs are entitled to summary judgment. If it is not a limit or standard, but rather a description of the boilers, then UNC is entitled to summary judgment. The uncontroverted evidence shows that DAQ, the writer and issuer of the permit, intended the ambiguous 323.17 heat input capacity number to be a descriptor and not an enforceable limit. That interpretation is consistent with the language of the permit. Based on these undisputed facts, UNC is entitled to summary judgment.

18

The Fourth Circuit has recognized that, "if the language of a permit is plain and capable of legal construction, the language alone must determine the permit's meaning." *Ohio Valley Env't Coal. v. Fola Coal Co.*, 845 F.3d 133, 139 (4th Cir. 2017) (cleaned up). Where a permit condition is ambiguous, however, courts "must look to extrinsic evidence to determine the correct understanding of the permit." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 270 (4th Cir. 2001).

As stated, the heat input capacity language in Section 2.1.A is ambiguous. The Court noted when it denied the motion to dismiss that the condition could be read as a limitation. Doc. 30 at 4 (noting that "heat input is explicitly used in the Section 2.1.A 'Limits/Standards' chart, where it is a variable in the equations that determine specific limits for regulated pollutants."). But it can also be read as a descriptor, as "heat input capacity" is not explicitly listed as a stand-alone limit or standard in the chart where the limits and standards are set forth. *See* Doc. 42-10 at 14–15. Thus, it is appropriate to "look to extrinsic evidence to determine the correct understanding of the permit." *Piney Run Pres. Ass'n*, 268 F.3d at 270.

The uncontroverted extrinsic evidence here shows that DAQ, the entity that issued the permit, did not intend for the heat input capacity figure to represent an enforceable limit. In 2015, long before this lawsuit, regulators reviewed UNC's reports that the boilers had exceeded 323.17 mmBtu/hr heat input during compliance testing and the regulators found this to be acceptable. Doc. 42-11 at 1; Doc. 40-6 at 8. After plaintiffs gave DAQ a copy of the proposed complaint, Steve Hall, Technical Services Section Chief for DAQ, evaluated the issue again; he concluded that the "nominal heat input capacity" listed in the permit was a "descriptor" and "not considered to be an enforceable limit by DAQ." Doc. 58 at § III ¶ 15;

19

Doc. 40-6 at 8. The replacement permit issued by DAQ in August 2021 to govern UNC's future operation of these boilers is unambiguous in its removal of any reference to heat input capacity in the Section 2.1.A heading and it does not list the heat input capacity figure as an express limit or standard anywhere else. *See* Doc. 59-1 at 20. DAQ did not identify removal of the heat input capacity reference in Section 2.1.A as a significant change in the "Table of Changes" attached to UNC's replacement permit. Doc. 59-1 at 6–11. The evidence is thus undisputed that DAQ, the entity that issued the permit, did not intend for the heat input capacity figures in Section 2.1 to be enforceable limits. There is no evidence from any other witness that supports the plaintiffs' interpretation. UNC is entitled to summary judgment on this claim.

The plaintiffs contend that the Court's earlier denial of UNC's motion to dismiss is "the law of the case" and establishes that the permit limits Boilers 6 and 7 to 323.17 mmBtu/hr heat input. Doc. 42 at 20. But the Court did not rule that the permit language was plain or unambiguous when it denied UNC's motion to dismiss. Doc. 30 at 3–4. The Court held only that the plaintiffs sufficiently stated a claim based on the allegations in the complaint. At that stage of the litigation, it would have been inappropriate to rely on or consider evidence outside the pleadings. *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). Each party has now had a chance to develop evidence during discovery and to present that evidence in connection with the cross-motions for summary judgment. On the developed factual record here, it is clear that the ambiguous 323.17 mmBtu/hr heat input capacity serves as a descriptor of the boilers and not as an enforceable limit.

The plaintiffs also contend that the Court should not give any deference to DAQ's interpretation of the permit. Doc. 51 at 13–14. The Court agrees with the plaintiffs that DAQ's interpretation is not entitled to deference. But it is relevant, and it is entitled to respect.

DAQ's interpretation is before the Court in a memo written by a single agency staff member to the DAQ Director and Deputy Director. *See* Doc. 40-6 at 7 (showing internal memo from DAQ Technical Services Section Chief). This is quite different from an interpretation "arrived at after, for example, a formal adjudication or notice-and-comment rulemaking." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). Such agency "interpretations contained in formats such as opinion letters are 'entitled to respect' . . . but only to the extent that those interpretations have the 'power to persuade.'" *Id.* (cleaned up); *see also F.D.I.C. v. Cashion*, 720 F.3d 169, 179 (4th Cir. 2013) (refusing to grant *Chevron* deference to an IRS interpretation expressed in an information letter but finding it otherwise relevant and persuasive).

DAQ issued UNC's permit and is responsible for its terms. Its analysis is persuasive, given the ambiguity in the permit and the absence of other evidence contradicting the agency's own reading of the permit that it issued.

## B. Claim Nine

UNC operates a group of emergency diesel-fired generators on its campus, including a generator identified in the permit as Emission Source ID No. ES-Gen-12. Doc. 42-10 at 10. UNC periodically conducts "readiness testing" of its emergency generators to ensure that they

will start up as needed in an emergency and operate properly after a period of inactivity. Doc. 58 at § IV ¶ 2; Doc. 40-1 at p. 4 ¶ 13.

Permit condition 2.2.A is a pollution control measure that prohibits the concurrent operation of certain pollution sources owned by UNC. Doc. 42-10 at 48. Specifically, the condition requires:

> In order to ensure that combustion sources (emergency generators (ID Nos. ES-EG#21, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48, ESGen-49, and fire water pump ES-FP-3)) do not contribute to an exceedance of the 1- hour $NO_2$ National Ambient Air Quality Standard (NAAQS); the Permittee may only operate these generators . . . for readiness testing when generators (ID Nos. ES-006 and ES-007) are not operating and when readiness testing is not being performed for any other emergency generator, except ES-EG#21, ES-Gen-12, ES-Gen-13, ES-Gen-43, ES-Gen-48, ES-Gen-49, and fire water pump ES-FP-3.

Doc. 42-10 at 48. In somewhat plainer English, and as is relevant here, UNC can only operate emergency generator ES-Gen-12 for readiness testing when generators ES-006 and ES-007 are not operating and when similar testing is not being performed on other emergency generators.

On September 20, 2018, UNC ran ES-Gen-12 for readiness testing for 32 minutes during the concurrent operation of ES-006 and ES-007. Doc. 43-6 at 1. By operating ES-Gen-12 for readiness testing at the same time it operated ES-006 and ES-007, UNC violated the terms of the permit. But in order to prevail in a Clean Air Act case involving only past violations, the plaintiffs must show that the violation was "repeated." 42 U.S.C. § 7604(a)(1); *see Env't Tex. Citizen Lobby*, 968 F.3d at 365 ("[A] plaintiff must assert at least two violations of the same standard in order to allege a claim.").

22

Here, only one violation occurred: when ES-Gen-12 was readiness-tested on September 20, 2018, under circumstances prohibited by the permit. In the absence of a repeated violation, UNC is entitled to summary judgment.

The plaintiffs contend that a single violation of Section 2.2.A occurs when UNC operates ES-Gen-12 concurrently with either ES-006 or ES-007; that concurrent operation with ES-006 constitutes one violation; and that the concurrent operation of ES-Gen-12 with ES-007, even if it is also concurrent with the violative operation of ES-006, constitutes a second, repeated violation. *See* Doc. 42 at 25–26. But this interpretation focuses on the duplicative circumstances of UNC's violation rather than the violative conduct itself, which was the prohibited readiness testing of ES-Gen-12. In other words, UNC violated the permit when it conducted an illegal readiness test of ES-Gen-12. There is no evidence of a second readiness test that violated the permit terms. Therefore, there is no repeated violation.

## V.    The Plaintiffs' Motion to Amend the Complaint

After full briefing and oral argument in connection with the cross-motions for summary judgment, the plaintiffs filed a motion to amend the second amended complaint. Doc. 60. The motion stipulates to the dismissal of Claims Five, Six, Seven, and Nine. The plaintiffs consulted with UNC before filing the motion, however, UNC was unwilling to so stipulate under terms acceptable to the plaintiffs. *Id*. at ¶ 1. Given the foregoing analysis that UNC is entitled to summary judgment on all nine claims, the plaintiffs' motion is moot and the motion to amend will be denied.

23

## VI.    Conclusion

UNC is entitled to summary judgment on all nine claims. The plaintiffs have not made a sufficient showing that their members have suffered a concrete injury as a result of any recordkeeping, reporting, monitoring, or inspecting violations. In the absence of this showing, UNC is entitled to summary judgment as to the plaintiffs' claims raising these violations, designated in the second amended complaint as Claims Two through Eight. Because the uncontroverted extrinsic evidence shows that DAQ, the issuer of the permit, intended the ambiguous 323.17 mmBtu/hr heat input capacity number to be a descriptor and not an enforceable limit, UNC is entitled to summary judgment as to Claim One. And finally, because there is no evidence of a second test that violated the terms of the permit, UNC is entitled to summary judgment as to Claim Nine. For these reasons, the plaintiffs' pending motion to amend stipulating dismissal of Claims Five, Six, Seven, and Nine is moot and will be denied.

It is **ORDERED** that:

1. The defendant's motion for summary judgment, Doc. 39, is **GRANTED** and the plaintiffs' motion for summary judgment, Doc. 41, is **DENIED**.

2. The plaintiffs' motion to amend the second amended complaint, Doc. 60, is **DENIED**.

This the 30th day of August, 2021.

_____
UNITED STATES DISTRICT JUDGE

24